### WATER HAMMER ARRESTER CORPORATION v. TOWER.

#### Civil Action No. 756.

District Court, E. D. Wisconsin.

Dec. 16, 1944.

Thiess, Olson & Mecklenburger, by Bertram Wm. Coltman and Leonard S. Kleinfeld, all of Chicago, Ill., and Ralph W. Brown, of Milwaukee, Wis., for plaintiff.

Elwin A. Andrus, of Milwaukee, Wis., for defendant.

DUFFY, District Judge.

This is an action for a declaratory judgment that the patent in suit is invalid and not infringed. On February 17, 1942, U. S. Letters Patent No. 2,273,766, entitled "Water Hammer Arrester," was granted to the defendant on application filed on August 4, 1940. By letter dated February 19, 1942, defendant notified plaintiff of the issuance of the patent in suit and charged that water hammer arresters manufactured and sold by plaintiff infringed said patent. Defendant followed this with a second letter to plaintiff dated March 10, 1942, which again charged it with infringement of said patent. By a letter dated February 19, 1942, defendant also notified Cook Electric Company of Chicago of the issuance of said patent and charged that said company infringed by manufacturing and selling bellows used in the water hammer arresters manufactured by plaintiff. Because of the implied threat of a lawsuit, plaintiff was required to and did agree to save and hold harmless said Cook Electric Company by reason of its sale of bellows to plaintiff.

When water or other liquid under pressure is in transit through a pipe and is brought to an abrupt stop by the closing of a valve, periodic surges in kinetic energy are propagated in the water. These cause abnormal fluctuations in pressure and often produce violent concussions called water hammer. It is desirable that the stresses thus caused on the pipe, joints and attached machinery, and the attendant loud noises be eliminated, and such is the purpose of a water hammer arrester.

In 1936 Fleming Manufacturing Company manufactured and sold water hammer arresters. An installation was made at Allegheny General Hospital at Pittsburgh, Pennsylvania, in the late months of 1936. Installations were made elsewhere in 1937 and 1938.

Because of the unusual circumstances under which the application for the patent in suit was made, it is necessary to set forth the events leading to such application in considerable detail.

In 1936 Wills S. Fleming was the president of the Fleming Manufacturing Company, and in September of that year, utilizing the services of a patent attorney in Portland, Oregon, he filed an application for a patent on a water hammer arrester. Early in 1937 he resigned as president of the company, and the new officers, having learned that his application for a patent had been rejected and having no experience in patent matters, decided to employ patent counsel in Milwaukee. On April 20, 1937, the Fleming Manufacturing Company through its vice president, A. J. Brielmaier, employed the defendant to prepare and file an application for letters patent covering the invention, if any, in the water hammer arrester manufactured by said company. Defendant was also informed that the company had previously engaged the services of Professor Kessler of the University of Wisconsin, who was a national authority on water hammer, for help in perfecting their water hammer arrester, and that Kessler had developed an arrester using a different type of bellows. Defendant was furnished data and drawings of the device which the company had manufactured. Two or three days after defendant's employment, Professor Kessler came to Milwaukee and conferred with the defendant, and among other things showed him the report upon the units which

the Fleming Manufacturing Company had installed in the Allegheny General Hospital in 1936. Neither Professor Kessler nor Mr. Brielmaier had had previous experience in patent matters and they relied upon the defendant for advice and counsel.

About a week later the defendant and Brielmaier drove to the Hydraulic Laboratory at the University at Madison, and a demonstration was there given to the defendant of the arresters in action on pipe lines. He was also shown the interior of an arrester illustrated by plaintiff's Exhibit 90. At that time the defendant expressed the opinion that they "had something on which a patent would probably be allowed." He stated he would continue to prosecute the previously rejected Fleming application and would also prepare a new application based on the Kessler device. Shortly after the occasion of the defendant's visit to Madison, he made a report dated April 30, 1937, stating that the periphery of the piston formed a restricted passage and pointed out that it functioned to throttle the displacement of liquid within the cylinder and to thereby dampen the contraction and expansion of the bellows.

Months of conferences and considerable correspondence followed. On August 25, 1937, two drawings were sent to the defendant for the purpose of preparing the patent application. On October 11, 1937, defendant wrote to Professor Kessler submitting four proposed claims which he had drawn to differentiate the arrester which Kessler was developing from patents previously issued. In his letter he made mention of "sufficient diameter to restrict the passages between said discs and said casing." The proposed claims specifically include making the bellows with external pockets and of a sufficient diameter to form restricted passages between the bellows and the casing. These claims were prepared by defendant to read upon the Kessler type of arrester.

On November 1, 1937, defendant wrote Professor Kessler:

"Another matter to which thorough consideration should be given is whether an advantage is gained in *your absorber* by having the disks in the bellows of about the same diameter as the casing, so that the passage between each disk or flute and the casing is restricted.

"If such an advantage is found from such construction, then each flute or disk acts as a piston to displace liquid from one pocket to the other through a restricted passage." (Italics supplied)

On November 24, 1937, Professor Kessler wrote to the defendant:

" * * * I have always shown the bellows close to the casing and I would prefer to see them so constructed for purposes of guiding them under all possible location conditions likely to be used in practice."

On March 29, 1938, in a letter to his client, defendant wrote:

"The bellows which have been so far employed have had the discs act as bellows by making the discs of sufficient diameter to have a close fit within the case."

On May 18 the defendant wrote to Professor Kessler:

"I am in receipt of your chart showing

* * * * * *

"(3) Bellows containing air and oil in the form of foam and bellows disks acting as pistons."

The following day Professor Kessler replied, saying:

" * * * Of course this is coupled with the dampening action due to forcing water and foam through the elongated pockets and annual orifices, and the dampening effect due to the multiple piston effect."

So far as I can ascertain this is the first reference in the correspondence to a multiple piston effect.

On July 29, 1938, defendant wrote Professor Kessler enclosing a petition and oath and 23 proposed claims. The petition listed Professor Kessler, John S. Baker, chief engineer of Cook Electric Company, and the defendant as co-inventors. Several days later defendant sent Professor Kessler a drawing to go with said application. This drawing is identical to the one on Page 1, Sheet 1, of the patent in suit. Defendant's suggestion of being a co-inventor promptly brought vigorous objection from his client. Professors Kessler and Rohlich came to Milwaukee and insist-

ingly told defendant that he was in no way a co-inventor.

On August 21, 1938, Professor Kessler wrote to the defendant:

"It is my hope that claims can be made that will cover more than the foam idea because I truly believe the coordinating of the particular type of bellows and the casing constitutes an invention. * * *"

In the latter part of 1938 and in the early months of 1939 the officers of the Fleming Manufacturing Company and also Professor Kessler pressed the defendant to get an application for their patent filed. In January, 1939, defendant prepared an application naming Kessler and Baker as joint inventors. While this was satisfactory to Kessler, it was objected to by Baker who refused to sign. In March a meeting was held in Attorney Lord's office in Chicago, attended by Professor Kessler and Brielmaier, at which time defendant expressed his opinion there was only a 10% chance of obtaining a patent. Upon learning that the cost involved would be about $150, Professor Kessler and Brielmaier decided to take that chance. In early May, 1939, Brielmaier asked the defendant to prepare an application to be signed by Professor Kessler alone. Apparently nothing was done promptly in compliance with this request. Then on September 4, 1939, Professor Kessler wrote to the defendant, saying:

"More than two years have now elapsed since Mr. Brielmaier and I approached you on the subject of Water Hammer Patent applications involving what we believed to be a new type of arrester. * * * Both Brielmaier and I feel that the patent application should be completed on the basis of the facts as you have them. They should be filed immediately. * * *"

To this defendant replied on September 12, 1939:

"I am now revising the application and it will be ready some time next week."

For more than ten months thereafter nothing was heard from the defendant. On July 24, 1940, defendant telephoned Brielmaier; on the 25th he wrote to Professor Kessler enclosing the proposed ap-plication for patent; and on the 26th he telephoned Professor Kessler. On July 30 Professor Kessler replied:

"I was taken by complete surprise by your phone call of July 26 stating that you were forwarding the Patent Application Document, because it was ten months since I had any contact with you. * * * In view of your delay in preparing this patent application, it no longer has any value to me. * * *"

Professor Kessler testified that in the meantime another patent counsel had informed him a patent would not issue when more than two years had elapsed after the public use of device disclosed. Furthermore, the application contained a disclaimer clause that the close fit was the invention of another.

Within four days from the receipt of Professor Kessler's letter defendant filed the application for the patent in suit. He listed himself as the sole inventor. He did not notify Professor Kessler, Mr. Brielmaier, or the Fleming Manufacturing Company that he had filed the application and they had no knowledge of same.

After defendant had been employed for several months he billed the Fleming Manufacturing Company for services rendered. In November, 1937, Mr. Brielmaier told the defendant that the company had only limited resources, that financially it was not in a position to pay such bills, that certain of the stockholders of the Fleming Manufacturing Company who had faith in the water hammer arrester were advancing the money to develop it, and that by agreement with the company they were to receive additional stock therefor. On numerous occasions the formation of a new company was discussed with the defendant and he made several suggestions about it. It was agreed that defendant would take stock in the new corporation to be formed. From December, 1937, defendant rendered no further bills for services until April, 1941, when he submitted a bill for $12,900.

The plaintiff company was organized on April 3, 1939. Mr. Brielmaier was made president and Professor Kessler also became an officer. The Fleming Manufacturing Company was paid all money that it

had invested in the experimental and research work and all other expenses in the development of the water hammer arrester, and the plaintiff took over the water hammer arrester business. Professor Kessler and Mr. Brielmaier had various conferences and correspondence from April 3, 1939, to September 12, 1939, with the defendant as to the patent application. Defendant contends he did not know that the plaintiff had in fact been organized, although defendant's secretary suggested the trade name used by the plaintiff, "Wacor," consisting of the first two letters of "water hammer" and the first three letters of "corporation." Brielmaier was the president of each company and both continued to operate until January, 1941, when the Fleming Manufacturing Company made an assignment for the benefit of creditors.

During the prosecution of the patent in suit the claims were rejected upon prior art patents to Fulton (No. 1,169,250), Pepper (No. 1,916,635), and Peters (No. 1,959,-640), and apparently would have remained rejected upon the prior art except for an amendment to each claim on December 26, 1941, by the insertion of the following words, "upon deflection thereof and form constricted passages between said disks (plaits) and said walls of an order to." Demonstrating how these additional words affected the claims, after such insertion Claim 4 read:

"A water hammer arrester, comprising in combination, a casing enclosing a cylindrical chamber and having an inlet to admit water subject to impulses in pressure, a plicated metalic bellows arranged within said casing to partition said chamber into an expansion compartment between said bellows and said casing to receive said water and a sealed compression compartment to contain a compressible fluid to absorb energy from said water and said bellows being composed of annular disks spaced apart from each other and joined together at the inner and outer perimeters thereof in alternation by flanges formed thereon and said disks forming annular pistons fitting close to the walls of said chamber to guide said bellows *upon deflection thereof and form constricted passages between said disks and said walls of an*

*order to* throttle displacement of water from the external pockets between said pistons to absorb energy from said water upon deflection of said bellows by said impulses in pressure, and a compressible fluid confined within said sealed compression compartment to absorb energy from said water upon its impulses in pressure to limit the amplitude of its fluctuations in pressure." (Italicizing of amendment supplied)

Defendant presents several defenses:

(1) That in spite of his letters charging infringement he now has determined plaintiff has not infringed because in its devices the clearance between the casing wall and the bellows is $\frac{1}{16}$" whereas a clearance of not greater than $\frac{1}{32}$" is indicated in the patented arrester, and since he now admits there is no infringement, no basis for an action for declaratory judgment remains; (2) that the patent in suit is valid and that the defendant is the original and sole inventor thereof; and (3) that he obtained said patent in his own name for the benefit of the Fleming Manufacturing Company and those who had advanced funds for the development of the water hammer arrester, and that he has always stood ready to assign said patent to said Fleming Manufacturing Company or to the persons who advanced the funds for its development, and that plaintiff has no right to said patent and is not the successor of the Fleming Manufacturing Company.

▇ The first defense cannot be sustained. The mere fact that after this action was commenced defendant concluded and stated plaintiff's device does not infringe the patent which he previously twice charged the plaintiff with infringing cannot deprive the plaintiff of a judgment from this court as to its validity. An actual controversy existed and still exists in spite of the defendant's belated conclusion of non-infringement. Title 28 U.S.C.A. § 400, Sec. 274d, Jud.Code, authorizing actions for declaratory judgments, should be liberally construed to obtain its objective which is to expedite and simplify the ascertainment of uncertain rights. Reliance Life Insurance Co. v. Burgess, 8 Cir., 112 F.2d 234. If the defendant were permitted to change his mind on the question of infringement

after this action was commenced, and avoid a judgment on the issue of validity, nothing would prevent a switch again to the conclusion plaintiff was infringing after the action was dismissed.

As to the validity of defendant's patent, there is no disclosure in the patent that a clearance of ⅟₃₂″ is required in order to obtain the multiple piston action. Although the correspondence between the defendant and those interested in the water hammer arrester was of considerable volume, absolutely no mention whatsoever was made of a clearance of ⅟₃₂″. While on the one hand defendant insists that the ⅟₁₆″ clearance between the bellows and the casing as shown in plaintiff's devices as far back as 1936 would not produce the necessary throttling effect but that a ⅟₃₂″ clearance would accomplish that result, yet defendant's expert would not say at what point less than ⅟₁₆″ the loose fit would disappear or at what point greater than ⅟₃₂″ the throttling effect would come into existence. While most of plaintiff's devices had a ⅟₁₆″ clearance, the one shown in Exhibit 2 is ³⁄₆₄″, which is halfway between ⅟₁₆″ and ⅟₃₂″. If an allowance of ⅟₆₄″ is made for the skid wires in such device, then the plaintiff's clearance between the casing wall and bellows as shown in Exhibit 2 is ⅟₃₂″, the exact critical dimension alleged by the defendant.

■ But in his patent defendant did not define the variant upon which he now attempts to predicate invention in order to distinguish over his client's disclosures. He not once mentioned ⅟₃₂″ in the specifications or in the claims. If experimentation is necessary in order to determine when infringement occurs, the patent is invalid. United Carbon Co. et al. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232.

The defendant failed to define a close fit between the casing and bellows in his patent but now attempts to restrict it to ⅟₃₂″ as distinguished from ⅟₁₆″; but he gives no information as to the twilight zone so that the public has no way of knowing the limits of his patent. Schriber-Schroth Co. v. Cleveland Trust Co. et al., 305 U.S. 47, 573, 59 S.Ct. 8, 83 L.Ed. 34. See also Johnson Chair Co. v. Milwaukee Chair Co., D.C., 38 F.Supp. 371. How could a person skilled in the art construct and use the invention after the expiration of his patent? Permutit Co. v. Graver Corp., 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163. It is apparent that the limits of the dimension producing this throttling action cannot be determined and are not capable of being determined mathematically.

In my opinion it is extremely doubtful that the defendant conceived the multiple piston action producing unbalanced pressure. He had no previous experience with water hammer arresters, while Professor Kessler was a nationally known authority. Professor Kessler, together with Professors Rohlich and Gamet, conducted over 3,000 tests before defendant was ever employed. They surely knew of the functional resistance caused by liquid flowing through the small clearance between the casing and the bellows. Nowhere in the voluminous correspondence did defendant claim to be the inventor of the idea of throttling the liquid between the bellows and the casing due to a close fit. Even though the defendant were the first to use the words "multiple piston action," mere words do not and cannot change the operation of a given structure.

■ Claims 1 to 4 inclusive are invalid because the water hammer arrester defined thereby was publicly demonstrated at the Hydraulic Laboratory of the University of Wisconsin more than two years prior to the filing of the Tower application. They are also invalid because of publication in the January, 1938, issue of the Journal of the American Water Works Association, and the April, 1938, issue of "Public Works" of articles disclosing the water hammer arrester defined by Claims 1 to 4 inclusive of the patent in suit.

■ But, in any event, defendant is estopped to assert that he is the inventor. Patent attorneys by the very nature of their duties are charged with a confidence and trust of the highest degree. The law does not favor the filing of an application for letters patent by patent counsel, especially where it relates to the subject matter of his engagement. The relation between the attorney and his client is too sacred to admit even the shadow of abuse. Every doubt

738

will be resolved in favor of the client. Baumgardner v. Hudson, 51 App.D.C. 150, 277 F. 552, at page 555. In that case the court said:

"In a case of this sort, the burden is heavily upon the attorney to show, not only priority, but that his conception of the invention was in no way the result of confidential knowledge derived from his client. * * *"

Defendant's claim that he took the patent in his name for the benefit of the Fleming Manufacturing Company and those who put up the funds for development does not militate against the relief asked for herein by the plaintiff. When defendant filed his application for patent he failed to notify anyone connected with the Fleming Manufacturing Company. He made no tender of an assignment to the receiver of said company. Apparently the patent was prosecuted without the knowledge of those who had been in frequent contact with the defendant, and the patent still stands in defendant's name.

Plaintiff is entitled to the relief requested in the complaint.