**MUSHER FOUNDATION, Inc., v. ALBA TRADING CO., Inc.**

No. 338.

Circuit Court of Appeals, Second Circuit.

July 18, 1945.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

Eric Y. Munson, of New York City, for appellant.

Joffe & Joffe, of New York City (Joseph Joffe and Benedict Joffe, both of New York City, of counsel) for appellee.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment dismissing its complaint for the infringement of the two claims of Patent No. 2,221,404, granted to the plaintiff on November 12, 1940, upon the application of Sidney Musher. The defendant did not put in any evidence of the prior art, but relied upon two points: that it did not infringe Claim One and that Claim Two was invalid for indefiniteness. The disclosure is for a process of making an imitation olive oil by infusing a "glyceride" oil—such as cottonseed, or corn, oil—with a "macerated" paste made from dried olives: the first claim is for the process; the second, for the product. Briefly described, the process is as follows. Ripe olives are laid in layers alternating with salt, the optimum proportions being in weight about two of olives to one of salt. The resulting brine is allowed to remain from one to three days, is then poured off, and at the end of from fifteen to thirty-five days the olives have lost about seventy-five per cent of their moisture, and will contain from five to ten per cent of salt. They are then taken out of the brine and dried in various other ways described, until they have lost at least eighty per cent of their original moisture. They are then "ground to a fine paste." (At times it may be necessary to soak them in oil for a short while before doing this.) After grinding, they are put through a "stone or iron rolling or colloid mill," "in order to finely mill and divide the olive into a paste form"; so fine indeed that "when rubbed between the fingers, the individual particles * * * can no longer be felt." It is often desirable during this stage of the process to add not more than half in weight of the oil which is eventually to be infused.

This paste is then thoroughly mixed with whatever "glyceride" oil is to be used, in proportions of not more than twenty-five per cent of paste—the best proportion being less than ten and even as low, at times, as one half of one per cent. This infusion is carried on "preferably while the oil is at a slightly elevated temperature or such as is about 160° F. to 200° F. and desirably at about 175° F." Thereafter the mixture is "agitated" for "from one minute to several hours;" and it is then filtered to take out "undesired solids." When possible, it is "particularly desirable" after the paste and oil have been mixed "at the slightly elevated temperature" to put the mixture through a "colloid mill"; and that dispenses with any period of subsequent "agitation." If "dried salted olive is added to the glyceride oil and the entire composition put

through a colloid mill or similarly dispersed, it is unnecessary to apply heat during the infusion procedure." The process may be carried out, though it is "a much less preferable alternative," by using very little salt—"about 1% to 2%—or none at all." We quote the two claims in the margin.[1]

The defendant makes its product out of a base of corn oil with a paste of black—ripe—olives (to which it adds an undisclosed proportion of green olives for color only). Upon a deposition taken before trial it described the process as follows: "The black olives are first crushed in a standard olive press and then are ground in a standard grinder commonly called a funnel grinder. This paste is placed in the oil and left for a certain number of days until the flavor of olives and taste of olives is discharged into the oil. This oil is filtered in filter bags, and refiltered by pressure into tanks, and when a clear greenish color is obtained it is packed in cans. * * * We press the black olives in a standard olive press. Then we crush. Then we grind in a standard funnel grinder and that paste is put into the corn oil for a length of time to discharge the flavor and taste of olives. Now when that product is finished we take some oil from the green olives crushed that we have put together that is to discharge a part of the green olive color and place into the finished product to impart a greenish color to the entire bulk of the finished product." The moisture from the black olives is extracted "by mechanical means or dried in the sun"; salt is not used upon the black olives; and the infusion is carried on for three days. It will be noted that the olives after grinding are spoken of as forming a "paste"; but at the trial the testimony was that they were ground only so as to pass through a sieve of a quarter inch mesh. We shall assume that this is the defendant's present practice. When this process is compared with that described in Claim One, two differences, and only two appear: the process is carried on at room temperature and not for a "short time." The judge thought that these differences avoided infringement, and for that reason dismissed the complaint as to the process claim.

■ The specifications speak of heating as in any case only "preferred" during the infusion. Moreover, when dried salted olives are added directly to the oil, and put through a colloid mill, no heat is necessary; and the period of subsequent "agitation" can be entirely dispensed with, when the paste, after being thoroughly dispersed under heat, is put through such a mill. The undisputed testimony was that temperature and time are correlative factors in the infusion, as is generally the case in all chemical processes: i.e. the time may be shortened, if the temperature is raised, and must be lengthened, if it is not. Claim One selects, as the combination, "a slightly elevated temperature" and "a short time"; the defendant departs from this by using no heat but allowing the infusion to go on for three days at least. When dealing with such a claim, it would certainly be wrong to divorce heat and time into two separate elements; and to hold that, because the defendant left out heat, but greatly lengthened time, it omitted one of the constituents of the claim. The combination of the two correlatives constitutes a single element; and, although the defendant has not adopted the combination specified in the claim, it seems to us that the combination which it substitutes is an equivalent. There was absolutely no prior art; for the passing references in the testimony to earlier processes, on which the defendant relies, were totally inadequate under well settled law; moreover, the invention has had a very considerable success. Of course, the fact that verbally the infringing process is not within the claim is no objection to the application of the doctrine of equivalents; indeed it creates the very occasion which should evoke it. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 50 S.Ct. 9, 74 L.Ed. 147; Claude Neon Lights v. E. Machlett & Son, 2 Cir., 36 F.2d 574, 575; Black & Decker Manufacturing Co. v. Baltimore Truck Tire Service Corporation, 4 Cir., 40 F.2d 910, 914.

---

[1] "1. The method of treating a glyceride oil to give it novel flavor and odor characteristics which comprises infusing said oil at a slightly elevated temperature with a small amount of a low moisture containing, dehydrated, macerated olive paste for a short period and then removing the olive paste solids therefrom.

"2. A substantially stabilized glyceride oil having novel flavor and odor characteristics containing a small amount of the glyceride oil soluble constituents derived from a dehydrated, low moisture containing, macerated olive paste, the oil being substantially free of the fibers of said olive paste."

888

■ The defendant insists that the plaintiff is estopped to claim any equivalents by its cancellation of three claims (quoted in the margin[2]), all of which did not contain the element of heat. These claims were not cancelled to escape rejection upon a reference from the prior art cited by the examiner; they were "voluntarily" withdrawn after they had been allowed along with the claims in suit. We are told that the cancellation was for the purpose of inserting them in another pending patent; but, although there is nothing to contradict this, we shall dispose of the case on the assumption that the reason does not appear, for the record is silent. It is of course a well-settled exception to the doctrine of equivalents that, when an examiner rejects a claim upon the prior art and the applicant withdraws it, the disclosure pro tanto passes into the public domain. The applicant may not by resort to the doctrine of equivalent interpret any claim which he succeeds in getting allowed, so that it will cover the contents of the rejected claim without some limitation. Smith v. Snow, 294 U.S. 1, 14, 15, 55 S.Ct. 279, 79 L.Ed. 721; Schreiber Co. v. Cleveland Trust Co., 311 U.S. 211, 220, 61 S.Ct. 235, 85 L.Ed. 132; Exhibit Supply Co. v. Ace Patent Co., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736. The reason for this is that if the rejection is wrong, the applicant has remedies both in the Patent Office and in the courts: remedies which the cancellation of the rejected claim necessarily surrenders. That surrender does not of course result in a dedication of all species of the genus surrendered; but it does surrender any monopoly upon the genus as such: i.e. unless it be restricted to some species of that genus. When an applicant cancels a claim which has already been allowed, none of this reasoning applies, and at best it becomes an open question which must be proved, whether he intends to surrender the disclosure in such sense that he abandons any equivalents of the elements of those claims which he keeps. Certainly no such intent was proved here. Be that as it may, there is a conclusive reason in this case which would put Claim One outside the exception, even if it had been shown that the applicant had actually intended to surrender the contents of the cancelled claims. All of them contained as an element that the paste or the olives must be salted; and the defendant does not salt the olives out of which it makes its paste. The applicant may well have cancelled the three claims in question precisely, because they did not include that "much less preferable" alternative, which he had disclosed and claimed. We therefore hold Claim One entitled to the same range of equivalents as though the three claims had not been cancelled; and that, when the defendant lengthened the time and reduced the temperature, it adopted the equivalent of a "short" time and a "slightly elevated temperature." B. B. Chemical Co. v. Ellis, 1 Cir., 117 F.2d 829, 833 was very close on the facts.

■ The attack upon Claim Two is based solely upon its indefiniteness: the defendant challenges it because it does not sufficiently describe the product, particularly because of a supposed conflict with General Electric Co. v. Wabash Appliance Co., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402. The first objection is that the introductory clause tells nothing: "A substantially stabilized glyceride oil having novel flavor and odor characteristics." As in the case of any other claim, a product claim may, and indeed must, be read upon the specifications: its terms are no more than a shorthand from the fuller explanation which the specifications should contain. Whatever may have been the recent tendency of the Supreme Court to bear more heavily than in the past upon indefiniteness of diction in claims, there can be no doubt, at least in the case at bar, that all the terms used in Claim Two are anchored in the specifications, and do not speak in terms of function—the only reason given for rejecting reference to the specifications in the last

2 "1. The method of treating a glyceride oil to give it novel flavor and odor characteristics which comprises forming a salted, dehydrated olive paste, mixing said paste with a glyceride oil, passing said mixture through a colloid mill and removing the undissolved solids."

"2. A glyceride oil composition having novel flavor and odor characteristics containing a small amount of the glyceride oil soluble constituents derived from a dehydrated, salted, low moisture containing, macerated olive paste, the oil being substantially free of the fibers of said olive paste."

"5. The method of treating a glyceride oil to give it novel flavor and odor characteristics which comprises finely macerating a relatively small amount of salted, dehydrated olives with the glyceride oil and then removing the undissolved olive solids therefrom."

decision upon the subject. United Carbon Co. v. Binney, 317 U.S. 228, 234, 245, 63 S.Ct. 165, 87 L.Ed. 232 ("the description in the specification is itself almost entirely in terms of function," 317 U.S. at page 236, 63 S.Ct. 169, 87 L.Ed. 232). To proceed to the details: the specifications define "substantially stabilized" in the following passage: "materially improved in keeping quality, and it is frequently possible to extend the life of a glyceride oil by three or four times" (p. 2, col. 2, lines 12-14). ("Substantially" is not of itself fatal to a claim; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 65, 43 S.Ct. 322, 67 L.Ed. 523: indeed, it must always be implied in every claim, even when not introduced, and adds nothing when it is. Were this not true, few patents could give any protection, for some departures from the precise disclosure are nearly always possible without losing the benefit of the invention.) The specifications several times describe the words "novel flavor and odor" (p. 1, col. 1, lines 3 and 4; lines 26–34; p. 2, col. 2, lines 8–10; lines 26–28; lines 32, 33); indeed, they scarcely need any description, being themselves self-explanatory. Again, the specifications define the word "small" by limits in specified percentage (p. 2, col. 1, lines 49–52; col. 2, lines 3, 4). Finally, "substantially free of the fibres" means "filtered" or "centrifuged" (p. 2, col. 1, lines 60, 61; lines 74, 75). It is impossible to suppose that anyone who really wished to respect the patent would have any difficulty in identifying what the claim covered.

▮ We agree with the judge that "manufacturing an imitation olive oil by infusing a macerated oil paste made from dried olives, into glyceride oil, is not what was patented"; but we do not agree that the ingredients of the product and their proportions are not incorporated by reference. The claim describes a glyceride oil into which there has been infused those constituents, which will dissolve out of a specified proportion of a dry, macerated olive paste, all of which is to be found in the specifications. There is no ground whatever for supposing that General Electric Co. v. Wabash Appliance Corporation, supra, 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402, meant to hold that the claim for a product may not be the claim for the product of the process described in the specifications. On the contrary that possibility appears to have been recognized:

"Even assuming that definiteness may be imparted to the product claimed by that part of the specification which purportedly details only a method of making a product, the description of the Pacz process is likewise silent as to the nature of the filament product." 304 U.S. at page 373, 58 S.Ct. 903, 82 L.Ed. 1402. It was likewise implied in Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 255, 48 S.Ct. 474, 72 L.Ed. 868, which was cited in the passage just quoted. Indeed, were this not true, it would always be possible to escape any process patent by making the product outside the United States, and importing it; the principle, perhaps the only, office of a product patent is just that. Rather the doubtful question is, when a patent describes a process, whether it can cover any other product than that made by the process. The patentee by hypothesis had contributed only the process; and it is not often that the product merely as such: that is, merely as a new conception—will satisfy the test of invention.

Judgment reversed; judgment for the plaintiff on both claims.