35 C.C.P.A.(Patents)

## Application of DAVIS et al.

### Patent Appeal No. 5355.

Court of Customs and Patent Appeals.

Nov. 29, 1947.

Ellis S. Middleton, of Stamford, Conn. (Edmund H. Parry, Jr., of Washington, D. C., of counsel), for appellants.

W. W. Cochran, of Washington, D. C. (E. L. Reynolds, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

GARRETT, Presiding Judge.

Appellants bring before us for review the decision of the Board of Appeals of the United States Patent Office affirming the Primary Examiner's rejection of three claims, numbered 8, 9, and 10 of appellants' application for patent broadly entitled "Production of Acrylonitrile," which, it is said, is sometimes called vinyl cyanide.

All the claims were rejected by the Primary Examiner, but the board reversed as to the method claims and seven claims for the method stand allowed. The appealed claims are for the product. They read:

"8. A stable acrylonitrile which shows no trace of hydrocyanic acid after storage after a period of at least six months.

"9. Acrylonitrile having the following properties:

Distillation range, 76.0°C.-79.0°C.,

Specific gravity, 25°C./25°C. 0.8025,

Acidity, less than 0.02% expressed as acetic acid,

Aldehyde, less than 0.01% expressed as acetaldehyde,

No hydrocyanic acid,

and capable of being stored for periods of from six to ten months without any substantial change in the above properties.

"10. Acrylonitrile which does not deteriorate under the influence of storage and shipping conditions produced by heating ethylene cyanohydrin in the presence of a sufficient amount of a residue resulting from the heat treatment of the ethylene cyanohydrin."

It is noted that claim 10 defines the product by the method of making it recited in allowed claim 1 which we here quote for convenience of comparison:

"1. The method of producing acrylonitrile which consists of heating ethylene cyanohydrin in the presence of a sufficient amount of a residue resulting from the heat treatment of the ethylene cyanohydrin so as to cause dehydration of the ethylene cyanohydrin."

Reference patents were cited as follows: Groll et al., 2,097,155, Oct. 26, 1937; Britton et al., 2,263,436, Nov. 18, 1941; Finkelstein (Ger.) 496,372, Apr. 24, 1930.

It may be said at this point that the Groll et al. patent appears to have been cited by the examiner solely in connection with his rejection of the method claims and it does not appear to have any application here. Also, we fail to discern any reference value in the Britton et al. patent in connection with the appealed claims. Except for formally listing it with the references, the board did not mention it, nor does the brief of the Solicitor for the Patent Office before us refer to it. We think it clear that the German Patent to Finkelstein, a translation of which is in the record, is the only reference with which we need concern ourselves.

As has been said, the examiner rejected all the claims and, in the first instance, the board approved the rejection of the method claims, or at least a part of them, in the form in which they were then drafted, but it suggested that by amending them and the specification in certain particulars they would be allowable "in the absence of more pertinent art." The amendments were made and the allowed claims appear in the record in the official form as amended. The product claims were rejected in the board's first decision and this rejection was adhered to in a second decision rendered on a request for reconsideration.

It will be observed that claim 8 calls for "A stable acrylonitrile * * *," and it seems to be agreed that claims 9 and 10 are so phrased as to mean that the product is stable, although the term stable is not used therein.

It is further agreed that the claims must stand or fall upon the matter of stability, and appellants attribute their asserted stability to the "residue resulting from the heat treatment of ethylene cyanohydrin," mentioned in appealed claim 10 and in allowed claim 1, supra. It is appellants' position that the residue so named forms a catalyst which renders unnecessary the use of extraneous catalysts and, in effect, that their residue catalyst causes a stability in the acrylonitrile not present in the acrylonitrile of the prior art—that is the Finkelstein patent. As we understand the board's decision, the allowance of the method claims, after they had been amended to conform to the board's suggestion, was based wholly upon the presence of the residue which was held to have a catalytic effect.

We quote the following from the brief on behalf of appellants:

"The Applicants discovered that by heating ethylene cyanohydrin to from 140°C. to 240°C. for a sufficient length of time, a residue was formed which was itself catalytic to the dehydration of ethylene cyanohydrin. In other words, the use of extraneous catalysts was unnecessary provided the ethylene cyanohydrin was heated to a temperature and for a time calculated to produce a sufficient amount of this catalytic residue. Further heating of this ethylene cyanohydrin in the presence of a sufficient amount of that residue caused dehydration of the former with the production of acrylonitrile and water.

"It is pointed out that this method was strictly a discovery and not a deliberate invention. The Applicants were, of course, aware that ethylene cyanohydrin could be dehydrated to form acrylonitrile and water using extraneously added catalysts. During the practice of that well recognized prior art, it was noted that during the dehydration procedure a residue formed in the dehydration vessel. It is an extremely complex organic material of unknown composition although its physical properties have been very accurately determined. It then occurred to these Applicants to attempt dehydration without the use of an extraneously added catalyst whereupon it was discovered that the residue itself was catalytic and produced desirable dehydration."

Counsel for appellants take the position that the stability of appellants' product is due to some impurity and he construes the examiner's statement following the appeal to the board as holding that appellants were claiming a product in merely purified form. The brief asserts:

" * * * This is not true. Our acrylonitrile is definitely impure because it contains some kind of a stabilizer. We know that absolutely pure acrylonitrile is unstable. Our acrylonitrile being stable,

there must be an impurity in it which is responsible for this characteristic."

We confess that it is not altogether clear to us whether or not the examiner construed appellants' position to be that they were claiming the product in a purified form, but whatever may have been his view of what appellants were really claiming with regard to the purity or impurity of their product does not seem to us to be of any particular moment here. It is not questioned that appellants produced a product which possessed some degree of stability whether it was pure or impure. This stability is defined in claim 8 by the statement that the product shows no trace of hydrocyanic acid after storage for a period of at least six months, and in claim 9 it is declared to have certain "properties" which will undergo no substantial change during storage periods of from six to ten months. Claim 10 recites that it "does not deteriorate under the influence of storage and shipping conditions."

The primary issue in this case is whether appellants' product differs patentably from the prior art, specifically from the disclosure of the German patent to Finkelstein. If it be found so to differ the question then arises as to whether the claims correctly define the difference.

As has been indicated, the board rendered two decisions in the case, the second being upon a request for reconsideration. In the first decision it said:

"From claims 8, 9 and 10 it appears that appellants consider that the invention may reside in an acrylonitrile which does not show deterioration on storage or any trace of hydrocyanic acid after six months storage. We do not regard this limitation as more than reference to a degree of stability."

The decision then further stated: "The invention, if any, lies in the method * * *."

In its decision on the petition for reconsideration, after holding in effect that the amendments relative to the method claims placed them in condition for allowance in the absence of pertinent art, the board said:

"Claims 8, 9 and 10, however, give no clue to the exact nature of the product ex-cept that it is exceptionally stable. We think the public should not be foreclosed to a discovery of a stable acrylonitrile made by another process. Claim 10 defines the product by the process but the latter is so broadly worded as to cover the processes of the prior art."

■ We have been somewhat puzzled by the board's failure to reject claim 10 squarely and unequivocally upon the ground that it defines the alleged invention only by the process of making it. The rule long has been established, and is so well known as to require no citation of authority, that claims of this character are not permissible except in cases where the product cannot be otherwise defined. In the instant case the alleged invention purports to be otherwise defined in claims 8 and 9.

As a matter of fact, the board's first decision which affirmed generally the action of the examiner would ordinarily be construed by us to be such a rejection, because, as has been pointed out, the examiner definitely held, applying the holding to claim 10, that defining a product in terms of the process of producing it "is not permissible," but in its second decision the claims seem to have been rejected by the board not upon the ground of defining the product by the method of making it, but because of its breadth being such as to "cover the processes of the prior art." We do not, therefore, treat claim 10 as having been finally rejected by the board on the ground that it defines the product only by the process of making it, but treat its rejection as being based upon the matter of stability along with claims 8 and 9. The brief of the Solicitor for the Patent Office discussing this phase of the controversy, states (we omit record page references):

"It is unnecessary to determine whether this attempted definition of the product by the process of making it is proper since, as the board points out * * *, the process as defined does not distinguish from that of the prior art. Finkelstein * * * explains that "unchanged ethylene cyanohydrine can flow back into the vessel" in which the heat treatment is being carried on. This unchanged material is the residue called for by claim 10. The statement in

the claim that the amount is 'sufficient' cannot distinguish over the reference, since it is not stated what the purpose is for which it is sufficient. The amount of this residue used by Finkelstein is sufficient for his purposes, and sufficient for the production of acrylonitrile. If it is the appellants' position that the claim means that enough residue is used to produce a stable product, then it adds nothing material to the claim, since the first two lines of the claim state that the product is stable."

We may remark that if the solicitor correctly construes the board's decision as holding that "the process as defined does not distinguish from that of the prior art," then it is difficult to understand how the process claims could properly have been allowed. They were allowed, however, and, of course, are not involved before us.

Another phase of the controversy grows out of expressions by the examiner and the board relative to the product claims dominating the art. The following appears in the second statement of the examiner:

"The product claims are submitted to be to the old product, acrylonitrile, disclosed by the references. Whether applicant claims a comparative purity or an undefined impurity, the claims are really to an old product. An old product merely in purified form is ordinarily considered to be unpatentable over the old compound, and it is not believed that an undefined impurity should be made a basis of patentability. While the product of the German patent, apparently produced by the same steps, would anticipate the claims, they are in essence too broad in that the nature of any impurity is not established. The claims might well, also, dominate the acrylonitrile field, and it would be difficult or impossible to determine if they were infringed."

We do not understand from the foregoing that the examiner definitely held that the fact that the claims might dominate the field standing alone constituted a ground of rejection, but the statement of the board in its decision on the request for reconsideration, reading: "We think the public should not be foreclosed to a discovery of a stable acrylonitrile made by another process," admits of the construction that the board

deemed it proper to reject the product claims because some one hereafter might invent a new process for making the product.

We think it proper to say that if the board meant to hold that a product truly inventive should be denied patentability solely because some one might invent a process for making it different from the process by which it was actually made, then we disagree with the board in that respect. There may be various processes for making an old patented product, and such processes may be patentable, but the grant of a process patent would not, of course, affect the previously granted product patent.

If, therefore, the board's statement respecting that phase of the case is to be regarded as being of itself a ground of rejection, such ground is overruled.

As has been indicated, the primary issue respecting the appealed claims relates to the matter of difference, if any, in the stability of appellants' product and the product of the prior art specifically that of the German patent to Finkelstein. The board seems to have assumed from the claims that a difference exists by reason of, for example, the limitations respecting the time or times (six to ten months) elapsing after storage without any deterioration or any trace of hydrocyanic acid, but held such difference to be a matter of degree only.

It should be understood that the Finkelstein patent does not embrace any product claims, but it is clear, of course, that by the process defined in its three method claims acrylonitrile is produced. In its production a catalyst is used but the catalyst of the patents differs from the "residue" named by appellants which was held to have catalytic properties. This is one of the features, apparently the principal one, which distinguishes the process of appellants from the process of Finkelstein, but, as of course, it does not distinguish appellants' acrylonitrile from the acrylonitrile of the patent, nor do we find anything in appellants' application which differentiates the respective products as to stability or otherwise in any definite manner. Neither in his brief nor in his oral argument before

us did counsel for appellants point to anything in their specification which does so. It is true that appellants' specification uses the word stable many times while it is not used in the patent, but obviously this of itself is not sufficient to lend patentability to the product·claims. The word "stable" standing alone is not sufficiently definite.

Appellants sought to establish patentable difference, or, at least, to strengthen their case, by means of affidavits, particularly the affidavit of one Oscar F. Wiedeman, who in 1935 graduated from the Massachusetts Institute of Technology with the degree of Bachelor of Science in Chemical Engineering and after that was engaged in chemical research.

The other two affiants, Washington Hull and Myrl Lichtenwalter, both of whose qualifications seem good, merely prepared samples or batches of acrylonitrile which Wiedeman used in making what is designated in his affidavit as "oxygen bomb tests."

The several affidavits were introduced in connection with a request made of the examiner for reconsideration following what we assume from the record was his first rejection of the claims.

Without entering into details, it is deemed sufficient to state that affiant Hull said that he prepared a sample of acrylonitrile in substantial conformity with Finkelstein's example 1 (he gives four examples, the third being divided into two parts) and Lichtenwalter prepared samples stated to be in substantial conformity with Finkelstein's examples 2, 3a, 3b, and 4. The samples were turned over to Wiedeman for test.

Wiedeman in his affidavit stated, inter alia:

"4. That he is entirely familiar with the specifications imposed by the industry upon acrylonitrile acceptable to it, which include the following:

"a. The acrylonitrile must be free from suspended polymer. This is required because the presence of suspended polymer indicates that polymerization has already begun and hence such a product is not satisfactorily stable.

"b. The acrylonitrile must be free from hydrocyanic acid.

"c. The acidity of the acrylonitrile expressed as acetic acid must be less than 0.02%.

"d. The acrylonitrile in appearance must be a colorless liquid."

Affiant further stated that he was entirely familiar with acrylonitrile stability tests accepted as standard by one of the largest producers of the substance in the United States, and gave a description of the test which, he said, is referred to as "accelerated oxygen bomb test." We deem it unnecessary to set out the test here. Affiant stated that "* * * [it] is a valuable index of the stability of the acrylonitrile in that it greatly intensifies the deterioration which takes place in the ordinary storage and indicates the relative period over which the product may be stored without deterioration and its actual stability."

Affiant then stated that he took the several samples of material turned over to him by Hull and Lichtenwalter and refined them by rectification at 76° to 79°C., which it may be noted is in the distillation range named in appellants' claim 9. The distillates resulting from the refinement were examined, as we understand the affidavit, immediately after the process of rectification and after examination they were subjected to the accelerated oxygen bomb test described by affiant. In the case of the sample prepared by Hull the affidavit states:

"The distillate was immediately examined and found to conform to the above specifications. Upon subjecting the same, however, to the accelerated bomb test as above indicated over a period of four hours, the acrylonitrile would not meet any of the above specifications indicating clearly a lack of necessary and acceptable stability."

With respect to the sample prepared by Lichtenwalter purporting to be based upon Finkelstein's Example II, Wiedeman said:

"* * * [upon examination] Example II appeared to meet the above specifications as to stability. However, when subjected to an accelerated bomb test for a period of

four hours, the acrylonitrile was found to contain hydrocyanic acid and more than 0.02% acidity expressed as acetic acid and was off-color, which indicated clearly that the acrylonitrile did not have the accepted stability."

As to the other three samples, the affidavit is to the effect that upon examination, after the refining process and before the oxygen bomb test was applied, the distillates were found to contain more than 0.02% acetic acid, and in the case of III-A was also "off-color." So those three samples, even without testing, seemingly were deemed by affiant not to meet the specifications, supra, and after they had been submitted to the test for four hours there was further deterioration. So, they were regarded as not meeting the stability test imposed by the industry.

The affidavit further states:

"As a check, deponent made similar tests upon an acrylonitrile prepared according to the method of the above entitled application. The acrylonitrile was examined prior to the bomb test and found to meet all specifications for stability. At the end of a four hour accelerated bomb test, similar in all respects to those above mentioned, the material was still found to meet all points of the specification. Another sample of the same product was subjected to the accelerated bomb test for a period of sixteen hours and still found at the end of this time to meet all of the specifications for stability.

"8. As a result of the above, he draws the conclusion that acrylonitrile prepared according to the examples of the Finkelstein patent did not meet the accepted standards for a stable acrylonitrile while the material produced according to the above entitled application is definitely stable, even after an accelerated bomb test four times as long as that to which the material of the Finkelstein patent was subjected."

Neither the examiner nor the board discussed the affidavits. The examiner in his final decision merely said that they had been considered. The board did not mention them.

Upon the basis of the showing made by the affidavits, counsel for appellants in their brief before us argue that:

"The conclusion, therefore, is inescapable that the Finkelstein product was not made according to Applicants' method. * * * It is evident that Finkelstein relied entirely upon an extraneously added catalyst and could not possibly have heated the ethylene cyanohydrin long enough to obtain the catalytic residue responsible for lending the necessary stability to the acrylonitrile product."

We may think it may be conceded—indeed, in view of the allowance of the method claims by the board it must be conceded—that Finkelstein's product was not made by appellants' method. If it had been, even appellants' method claims properly could not have been allowed, but it does not follow that because Finkelstein's acrylonitrile was made by a process different from appellants' process that appellants are entitled to a product patent.

According to the affidavit of Wiedeman at least two of the batches of acrylonitrile made in conformity with Finkelstein's examples were in stable condition prior to being subjected to the oxygen bomb test, if we are to accept as standard the specifications defined by affiant, supra—and there is no basis in the record for not accepting them.

Specifically, the statements in the affidavits relative to samples 1 and 2 means that when examined prior to the oxygen bomb test they were free from suspended polymer; free from hydrocyanic acid; the acetic acid content was less than 0.02%; and the liquid was colorless.

These are the only elements present in the specifications said by Wiedeman to be "imposed by the industry upon acrylonitrile acceptable to it." The distillation range, 76° to 79°, used in refining the samples was the same as that named in appellants' claim 9. There is no mention, so far as we can find, of the specific gravity of the samples of the Finkelstein product, nor is it stated how much aldehyde his product contained. These are features not named in the spec-

ifications defined by affiant but mentioned in appellants' application and in his claim 9. There is, however, nothing to show nor is there any claim that the specific gravity or the aldehyde content are in any respect critical.

There is, of course, nothing in the specification about oxygen bomb tests, and we find nothing in the affidavits which gives any idea as to how long a period of storage corresponds to four hours of bomb test. It is true that Wiedeman stated that the accelerated oxygen bomb test "greatly intensifies the deterioration which takes place in the ordinary storage and indicates the relative period over which the product may be stored without deterioration," but there is no suggestion of a storage period. There is nothing in either the specification of the application or in the affidavits which suggests that six months or any other period has been established during which the material will lose in storage.

Assuming, as the board held, that it may be concluded from the record that there is a difference in degree in the stability of appellants' acrylonitrile and that of the German patent, that would not be sufficient to lend patentability to the product claims, since it is a difference in degree only.

Furthermore, whatever of difference may be deducible—whether of degree only or to a critical extent—we are confident that the claims do not define the difference with the clarity and definiteness required by R.S. 4888, 35 U.S.C. § 33, 35 U.S.C.A. § 33. See United Carbon Co. et al. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232, and numerous cases therein cited.

The decision of the board is affirmed.

Affirmed.