### INGERSOLL–RAND CO. et al. v. BLACK & DECKER MFG. CO.

#### Civ. A. No. 4698.

United States District Court
D. Maryland, Civil Division.

Jan. 3, 1951.

Frank B. Ober and Southgate L. Morison (Ober, Grimes & Stinson), Baltimore, Md., Stephen H. Philbin, Chester A. Adee, New York City, N. Y., for plaintiffs.

Thomas W. Y. Clark (Samuels & Clark), Baltimore, Md., Albert R. Golrick (Fay, Golrick & Fay), Cleveland, Ohio, for defendant.

CHESNUT, District Judge.

This is the usual type of patent infringement case and the defenses are the usual ones of invalidity of the patent and non-infringement. The patent in suit is United States Patent No. 2012916, issued August 27, 1935, to R. H. Pott (filed January 30, 1932) for an "impact tool". Holsclaw Brothers, Inc., has a reversionary right granted to it by Pott under the patent. An exclusive license to manufacture articles under it, and certain other patents, was granted by Pott and Holsclaw July 10, 1934 to Ingersoll-Rand Company, a New Jersey corporation, under an agreement by the latter to pay 5% royalties on net sales to Pott and Holsclaw. Charles B. Holsclaw, Trustee, represents certain beneficiaries who have an interest in said royalty agreement. Ingersoll-Rand and the other parties above named are the plaintiffs in this case. The defendant is the Black & Decker Manufacturing Company, a Maryland corporation, a large manufacturer of power tools. Ingersoll-Rand also alleged in its complaint infringement by the defendant of letters patent No. 2143173 (issued to Shaff in 1939) for a rotary driving tool, and No. 2220711 (issued Nov. 5, 1940 to Clifford E. Fitch) for an impact tool. But both the latter patents have heretofore been dismissed from this case with prejudice, with the consent of the plaintiffs.

An impact tool, generally speaking, is a mechanism for automatically striking repetitive hammer-like blows to accomplish a desired result as, for instance, the tightening of a nut on a bolt. The use of a manually operated hand wrench to screw down a nut on a bolt is a familiar operation. Ordinarily the thread of the nut fits sufficiently loosely into the thread of the bolt to screw the nut down the bolt until the nut becomes "seated", that is, its undersurface comes into contact with the

upper surface of the object through which the bolt projects upwards. To tighten the nut when thus seated requires considerable manual force with the ordinary hand wrench. But the type of impact tool with which we are concerned in this case is designed to automatically tighten the nut by the use of electric power transmitted through the mechanism of the particular tool.

The patentee Pott received collegiate instruction in mechanical engineering. After some years of practical experience he devised the mechanism described in the patent issued to him. It was for impact tools generally but he illustrated one form of the application of his mechanism as an automatic wrench. Holsclaw obtained apparently a majority interest in the then pending patent application and in association Pott and Holsclaw made 24 or 25 wrenches as described in his patent later issued. However, the tool made by them did not attain commercial success, and in 1934 they interested Ingersoll-Rand in their patent application and entered into a royalty agreement with it covering the particular mentioned patent and certain other patents then or later issued to Pott and others in which Pott and Holsclaw were also interested under the royalty agreement.

The mechanism described by Pott included a metallic spring and had the deficiency in utility of not being reversible in action, that is to say, while it could run the nut down on a bolt and tighten the nut when seated, it was not designed to unscrew a tightened nut. To overcome this difficulty Pott later devised and patented a tool in which a rubber spring was substituted for the steel spring and it is said that it accomplished the reversible effect. Ingersoll-Rand at first utilized this rubber spring but subsequently discarded its use because it was not sufficiently durable in use. Largely aided by the Shaff and Fitch patents above mentioned Ingersoll-Rand devised an automatic wrench substantially differing in construction from that described in the Pott patent and this latter tool did achieve commercial success as has been indicated by the payment in the aggregate of about $3,000,000 in royalties by Ingersoll-Rand to Pott and the Holsclaw interests. A patent was issued to Ingersoll-Rand on their mechanism but it is to be noted that it is not involved in this suit. It is not claimed by the plaintiffs that the Black & Decker tool infringes any claim of the Ingersoll-Rand wrench other than insofar, if at all, the latter uses an essential feature of the Pott tool. Nor is there any claim made by the plaintiffs, or at least there is no evidence in support of such a claim, that the Black & Decker wrench is either a slavish or even colorable imitation or cheaper edition of the Ingersoll-Rand wrench. On the contrary it is conceded that both these tools are now in entirely successful commercial use and accomplish about the same results. The Pott patent expires in 1952. It had been in force ten years before Black & Decker decided to add an automatic wrench to its line of power driven tools. It had a well staffed research engineering department which was engaged in studying the design for an automatic wrench for four years before one was satisfactorily developed and put upon the market in March 1949, after careful examination and opinion by reputable and competent patent attorneys that it was not an infringement of any prior patents.

The general purpose of an impact wrench is to lessen the strain upon the operator consequent upon the recoil of the tool when, after the nut is seated, the resistance to tightening causes the recoil which, under earlier forms of nut running tools, might be sufficient to wrest the handle of the tool itself from the hands of an inexperienced operator. Another feature of the present Ingersoll-Rand and Black & Decker wrenches is to make possible a much lighter tool but with power equal to a heavier tool.

Coming now to the more particular description of the Pott patent we note that it is generally for an impact tool and not specifically for an automatic wrench except insofar as the latter is used as an illustration of the application of Pott's idea. In the opening lines of his specifications he says "The invention relates generally to impact tools and more particularly to tools of this character for applying a tor-

sional force. An object of the invention is to provide a simple tool embodying a new and improved means for producing a succession of impacts of great force. A further object of the invention resides in the provision of an impact tool for imparting torsional force to a part engaged by the tool which embodies a novel means for increasing the force of the impact over the force delivered directly by a driving member. More specifically stated, an object is to provide, in a tool of this character, means for momentarily accumulating or storing up energy to be expended when the hammer part of the tool impacts the driven part or tool head."

The illustrative drawings show what may be roughly described as a heavy and clumsy pistol consisting of a lower extended hand grip for the use of the operator (of itself not important in this case), a heavy cylindrical upper part corresponding roughly to the butt of an automatic pistol, with a forward cylindrical projection corresponding roughly to the barrel of the pistol. At the right end the tool is connected with the power to be supplied by an electric motor. Inside the barrel is a metallic spring rigidly attached at the right end to the power means and at the bottom also rigidly attached to what may be described as a rotary hammer cylindrical in form but of shallow depth which has at the bottom two angular or obliquely faced jaws (or teeth or lugs) which in one position interlock with similar angular jaws on another metallic cylindrical part of the tool, called the anvil. At the left end of the tool connected with the anvil is a cap to fit over the nut. When the nut is being freely run down on the bolt (and until the nut becomes seated) the jaws of the hammer are interlocked or enmeshed or clutched into the corresponding angular jaws of the anvil. In this position the electrically rotated hammer and anvil are clutched together while turning the nut and running it down until it is seated. When the nut is seated its resistance to tightening causes a momentary separation between the only loosely interlocked surfaces of the anvil and hammer, in which the oblique jaws of the hammer ride or slip over the

corresponding angular faces of the jaws of the anvil; and immediately thereafter the downward thrust of the torsion spring, energized by the rotary force supplied by the electric power, causes the hammer and anvil faces to again engage and interlock, the oblique jaws of the hammer striking glancing blows on the jaws of the anvil, and thus transmitting, by rapid repetitive blows, the force necessary for tightening the nut. In this operation the angular faces of the jaws of the hammer perform a "camming" action. Pott also particularly stresses the thought that the energy stored up in the spring is released to drive the hammer ahead at a speed greater than the motor speed, thus increasing the force of the hammer blows on the anvil.

There are 18 claims in the patent but those first specified as infringed were claims 3, 4, 9, 15 and 16. As a result of the trial the claims that are now pressed by plaintiffs' counsel are claims 3 and 4 which read as follows:

"3. In a tool of the character described, the combination of two relatively movable members having complementary juxtaposed faces provided with releasable interengaging means constituting driving connections between said members under certain conditions of operation, said means being successively releasable and reengageable under other operative conditions, driving means connected with one of said members, and means for increasing the momentum of the driven member over that imparted thereto by said driving means as said members move relatively into reengagement.

"4. In a tool of the character described, the combination of a driving member, a driven member, driving connections therebetween including cam means for effecting relative separation of said members when movement of said driven member is resisted by a predetermined force and automatically re-engageable after release, a prime mover for said driving member, and driving connections between said prime mover and said driving member including means for accumulating energy as the result of resistance to rotation prior to relative separation of said members."

■ In view of the prior art, to be later more particularly mentioned, it is my opinion that these patent claims are invalid because they do not meet the required criteria for a valid claim of *invention*. It is not asserted by counsel for the plaintiffs that Pott introduced any new mechanical principle. Asserted patentability is based only on the contention that it constitutes a patentable "combination" as contrasted with what in patent law is called a mere aggregation of prior well known elements. In support of their contentions counsel cite in this Circuit Black & Decker v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910, and Langston Co. v. F. X. Hooper, D.C.Md., 8 F.Supp. 613, affirmed 4 Cir., 79 F.2d 992, and also Loom Co. v. Higgins, 105 U.S. 580, 591, 26 L. Ed. 1177; Seymour v. Osborne, 11 Wall. 516, 548, 20 L.Ed. 33. It is urged that the principle of these cases is to the effect that a combination of only old elements is nevertheless patentable if it produces a new and beneficial result. But it is important to note that now by the most recent decision of the Supreme Court a more severe test of invention is required. Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 129. In the opinion, speaking for a unanimous court, Mr. Justice Jackson said: "It is agreed that the key to patentability of a mechanical device that brings old factors into cooperation is presence or lack of invention. * * * The concept of invention is inherently elusive when applied to combination of old elements. * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, *but this is not a usual result of uniting elements old in mechanics. * * * Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements.* The function of a patent is to add to the sum of useful knowledge. Pat-

ents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly. * * * But commercial success without invention will not make patentability. * * * The defect that we find in this judgment is that a standard of invention appears to have been used that is less exacting than that required where a combination is made up entirely of old components." (Italics supplied.)

In that case a counter tray, as used in a self-service grocery store, to facilitate the checking of purchases by customers was held invalid despite the finding of a patentable combination by two lower courts and the undisputed facts that the device "speeds the customer on his way, reduces checking costs for the merchant, has been widely adopted and successfully used, * * *."

■ Despite the helpful guidance of this very recent opinion there is still no precise legal yardstick to measure the requisite standard of invention, other than the considered judgment of the trial or appellate judges which, as was long ago pointed out by Judge Learned Hand in the Second Circuit, is necessarily to a large extent by reason of the subject matter, affected by the subjective point of view of the judge. Each case must, therefore, unless and until there is more precise congressional direction, remain to be decided on its particular facts. It is, however, quite clear from this recent decision of the Supreme Court that a combination patent to be valid must hereafter be found to meet a more severe test than that the device is merely new and useful. My conclusion on the whole evidence is that the Pott patent presents only a combination of previously well-known mechanical elements, the sum of which does not constitute anything that

can be considered to meet the standard of invention now required of combination patents.

An analysis of the patent claims in connection with the specifications discloses no new mechanical principle. Apart from the power source to furnish rotation, the three essential elements of the combination are (1) a spring connected with a shaft, and also connected with a rotating (2) hammer which, by angular jaws, is enmeshed with (3) an anvil of similar cylindrical form, and which in turn has a projecting cap to fit over the nut. In operation the motor drives the shaft which acts on the spring and, during the free nut running movement, while enmeshed with the anvil, serves to run the nut down on the bolt, until the nut is seated, when the resistance to the tightening of the nut causes the momentary disengagement, by the camming action of the angular jaws, almost immediately followed by re-engagement resulting in fast repetitive hammer blows by the glancing impact of the hammer jaws on the anvil jaws. Claim 3 of the patent does not mention the camming means of the angular jaw faces of the hammer and anvil while claim 4 does. It is not claimed by the plaintiffs that any of these three elements perform any function not previously known. The very concept of an automatic impact tool is to strike hard repetitive hammer-like blows. Obviously a hammer and something like an anvil are elementary in this concept. Nor is there anything new in adding a spring as a third element whether it be a compression spring or a torsion spring. In plaintiffs' claims the hammer is referred to as a driving member and the anvil as the driven member. The emphasis of the plaintiffs' case is put upon the phraseology in both claims which refers to the part played by the spring in the tool. Thus in claim 3 the spring is described as "means for increasing the momentum of the driven member over that imparted thereto by said driving means as said members move relatively into re-engagement." And in claim 4 the spring is described in the clause reading "a prime mover (the external motor) for said driving member, and driving connections between said prime

mover and said driving member including means for accumulating energy as the result of resistance to rotation prior to relative separation of said members." It will be noted that the "means" referred to is not even specifically referred to as a "spring" but the patent drawings, used for illustration of one form of the application of the patent, do clearly show the spring. And it is argued that the idea that the function of the spring in the combination "for accumulating energy as the result of resistence to rotation prior to relative separation of" the hammer and anvil, constitutes what amounts to invention. Even if that could be held to be true in view of the prior art, it seems very doubtful to me that the wording is "consistent with the clarity required of claims which define the boundaries of a patent monopoly. 38 Stat. 958, 35 U.S.C. § 33, 35 U.S.C.A. § 33; United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232; General Electric Co. v. Wabash Corp., 304 U.S. 364, 58 S.Ct. 899, 82 L.Ed. 1402." Great A. & P. Tea Co. v. Supermarket Equip. Corp., supra.

Apart from this vagueness of the claims as worded, I find that there is nothing new in this combination of old elements. A rotating hammer impacting upon an anvil with or without angular enmeshing jaws engaging and re-engaging in dynamic operation was a more or less common feature of impact tools, and likewise when they are combined in their functioning with a spring or springs, either compression or torsion, and with or without the added feature of accumulating energy in dynamic operation. More specifically it will be sufficient in this connection to refer to the earlier United States Nielsen patent 1770656, the United States Scanlon patent 1671489, and even more importantly to the Weibull United States, Swedish, German and British patents. Thus the Nielsen patent discloses the principle of storing or accumulating energy in a flexible shaft connecting a rotary hammer mechanism to a source of power such as a motor and this stored energy intermittently acts on the rotating hammer mechanism "to im-

part to the striker block the maximum possible velocity at the moment of impact."

The United States Scanlon patent 1671489 deals with the problem of "unscrewing an element from a lost tool or string" in the operation of drilling a well. The relevance of that patent here is that the hammer is driven by a torsion stem and the energy is stored by the twisting of the stem when the hammer shoulders are in engagement with the anvil shoulders. Disengaging of the shoulders upon axial movement of the hammer relative to the anvil releases the stored energy in the stem and the hammer shoulders thereby are rapidly rotated by virtue of the torsional strain in the stem to deliver a blow to the anvil shoulders.

Even more particular consideration has been given to the Weibull American patent 1776057, the drawings of which disclose a mechanism quite similar in structure and operation to the Pott mechanism. In describing his mechanism Weibull does not claim any novel features with regard to the spring, the hammer, the anvil or the camming movement for re-engagement of the hammer and anvil. His aim was to provide additional features to minimize the effect of the recoil of the tool in operation. Thus he says, "The present invention relates to a mechanism for the conversion of rotary movement into a striking movement and differs from known arrangements of this kind by the fact that the recoil movement of the striking body is effected by its striking against the anvil or the like to which the striking force is transmitted and not, as hitherto, for instance, by the cooperation of a rotating motor driven part itself." And in the particular explanation of the drawings, with reference to the functional effect of the spring, on page 1, column 2, line 60, he says "For the storing of energy the striking body 3 is connected with the driving shaft by means of a tension spring 10, which has one end attached to the bolt 4 and the other end to a bolt 11 inserted in the end of the driving shaft. On the shaft 1 being rotated by the electric motor, the striking body 3 will be forced to partake into this rotation by means of the bolt 4 extending into the groove 2." He then proceeds to particularly describe

the effect and disposition of the energy in his particular mechanism for minimizing the recoil. In this he says: "Thus, the recoiling movement of the striking body will be gradually stopped. The striking body will then once more be thrown forwards by the influence of the energy, stored in the energy storing device, and after this, the same operation will be repeated. Thus, the striking body will receive its recoiling movement by the energy absorbed from the motor at the moment the shock or strike occurs, whilst the forward movement of the striking body is effected by the energy storing device."

Weibull further disclosed in his Swedish patent that a sole driving connection between the hammer and driving shaft may be a torsion spring. He stated (translation page 4), "The rotation of the motor can also be supposed to be transmitted to the hammer weight, not positively as indicated above, but resiliently through the spring device, if the latter is connected with the hammer weight and the driving shaft in such a way that the spring during the recoil movement of the hammer weight does not accumulate energy only by axial contraction or expansion, but also by rotation."

As a witness in this case Pott stressed that one of the objects of his patent was to minimize the recoil of the tool, but he makes only a very vague and apparently only incidental reference to the matter in his specification on page 2, column 1, line 73. The specification says, "The operation thus described is, of course, recurrent to produce a succession of blows for firmly seating the nut. In the absence of a rigid driving connection between the power input and the hammer, the shocks of the impacts cannot be reversely transmitted." In this connection it is to be noted that the lessening of the force of recoil was an object particularly stated by Weibull.

These three earlier patents are respectively more fully described in paragraphs 14, 15 and 16 of the separately made findings of fact in this case. The file wrapper of the Pott patent does not disclose that any one of these three earlier patents was cited against the patent in its consideration

by the Patent Office. If they had been, it would seem that patent claims 3 and 4 should not have been allowed, at least in such broad wording.

It is, of course, difficult in describing complex mechanical tools without the aid of drawings or diagrams, for the reader to clearly visualize the dynamic operation of such tools. But in this case I have had the advantage of viewing a motion picture showing the operation of a model made from the disclosures of the Weibull patent. It very convincingly demonstrated to me what I understand to be the operation of the Pott wrench. I am satisfied from the evidence that the model was fairly and correctly made by Mr. Brucker, a member of the Research Engineering Staff of the Black & Decker Company, and the motion pictures were made in the physical laboratory of the Johns Hopkins University under the supervision of Dr. Wm. H. Hoppman, Associate Professor of Mechanical Engineering there who, as a witness in this case, has more clearly explained the construction and operation of both the Pott and the Black & Decker automatic wrenches; and also even more particularly the principles disclosed by the three earlier patents which have been referred to.

As I find the Pott patent to be invalid in view of the prior art, it is, strictly speaking, not necessary to discuss the issue of infringement; but in view of the length of the record and the contentions of the parties with regard to infringement, it may be helpful to state my views upon that issue also. It must be remembered that while the Black & Decker tool in external superficial appearance looks like the Ingersoll-Rand product which has achieved commercial success, and while it is conceded that functionally both tools serve the same general industrial utility and are equally effective, it is the Pott patent and not the Ingersoll-Rand tool with which we are here concerned on the issue of infringement. It has not seemed necessary to me to discuss in this opinion the particular mechanism of the Ingersoll-Rand tool (although briefly described in the findings of fact) except insofar, if at all, as it includes the Pott device. I think it is sufficient to say in passing that

the Ingersoll-Rand modern automatic wrench seems to be based more on the principles of the Shaff and Fitch patents than on Pott. The Pott tool did not achieve commercial success. It had to be very substantially redevised under other patents by Ingersoll-Rand.

In the trial of the case counsel for the defendant emphasized the issue of noninfringement rather more than invalidity of the patent, stressing the well-known rule of patent law that, in view of the prior art, the claims of the Pott patent must be given a scope limited to the particular form of construction of the Pott tool; and that when so construed it is clear that the Black & Decker wrench does not infringe. It does not read upon either claims 3 or 4 and its mechanism is such that the combination of its parts cannot fairly be treated as equivalent in function. On the other hand, counsel for the plaintiffs maintains that it is not necessary to invoke the doctrine of equivalents because he asserts there is a literal reading of claim 3 at least upon the defendant's mechanism.

I do not so find. Pott describes his alleged invention as readily embodied in a comparatively simple tool. While it may seem anything but simple to the layman uninitiated in the terminology of mechanical engineering, the Pott mechanism is indeed simple when compared with the much more complex mechanism of the Black & Decker tool which required its research engineering staff years to develop. It is true that both Pott, Ingersoll-Rand and Black and Decker used in their respective automatic wrenches a functional combination of an external force for causing rotation and an internal combination of a spring or springs, a hammer and anvil and camming means for engagement and disengagement; but all these mechanical devices were well known in the prior art.

There are many differences both in structure and dynamic action between the Pott and the Black & Decker tools. To start with, it may first be mentioned that the Pott tool does not use a spindle; while Black & Decker does. Pott has only a torsion spring while Black & Decker uses both a torsion spring and a compression spring,

the latter inside the former. In addition to the hammer and anvil used by both there is in the Black & Decker mechanism a distinctly different and additional device consisting of an interior cylindrical member called a lifting cam member which, in co-operation with the compression spring, operates to alternately lower and lift the camming member into contact with the camming teeth of the anvil. The anvil of Black & Decker has *four* lugs, two with *perpendicular* faces spaced 180 degrees apart, and two *obliquely* faced lugs likewise spaced 180 degrees apart. Each of the lugs is 90 degrees separated from the other. The hammer has only two lugs each perpendicular which strike on the corresponding perpendicular lugs of the anvil. The third or camming member of the Black & Decker tool has only two lugs both faced obliquely. When the camming faces of the camming member are in contact with the oblique faces of the anvil the hammer lugs are not in contact with the anvil lugs and the hammer in that position is said to be "floating free". The effect of the camming lugs of the third member is to alternately engage and disengage the anvil and during each such disengagement the hammer lugs strike on the perpendicular anvil lugs. The third or camming member of the tool is placed inside of and is concentric with the cylindrical hammer. In operation the Black & Decker mechanism functions quite differently from that of Pott. While the nut is being freely run down on the bolt and until it is seated, the hammer and anvil of Black & Decker are not in contact; but the third or camming member is enmeshed with the anvil by the compressing spring. When the nut becomes seated and has to be tightened the resistance causes the disengagement of the clutched anvil and camming member, which allows the hammer to contact the anvil, the two perpendicular lugs of the hammer striking squarely on the similar lugs of the anvil, rebounding, and then by the lifting action of the camming member, being lifted over the perpendicular anvil lug to strike again and so on repetitively, the striking force being augmented by the stored energy in the torsion spring. The Black & Decker tool accom-

plishes both the tightening of a nut, and if desired the same tool can reversibly loosen a tightened or frozen or rusted nut. As already pointed out, the Pott patent is not reversible for the same tool. The torsion spring in Black & Decker is only loosely connected at both ends, while the Pott spring is rigidly connected. The anvil and hammer lugs in Pott perform the triple function of clutching camming and impacting; while the lugs on the Black & Decker hammer and the perpendicular anvil lugs have the single function of impacting.

The construction and operation of the Black & Decker tool is more fully described in paragraphs 10 and 11 of the findings of fact which, for possible clearer explanation, are here repeated.

"The defendant's accused tool has a cam released spindle driven clutch acting on camming clutch teeth on the anvil to drive the nut to its initial seating position, and a concentric separate free floating, in rotary motion, hammer moved by a torsion spring and arranged to serve like an interrupted torsion pendulum. The hammer is lifted by the free nut running cam clutch and is released to deliver its blows by the passage of those cam faces on the separate clutch while being separate in its rotary impacting motion.

"In the accused tool when the cam clutch mechanism is running down a nut and before nut seating, the hammer impact lugs are spaced angularly away from the anvil impact lugs. The anvil lugs are angularly displaced 90 degrees from the anvil camming clutch teeth and are placed outwardly radially from the camming teeth, to be out of the path of rotation of the camming teeth. In slow motion if the anvil is held and the camming clutch member and the hammer are slowly rotated to cam open the clutch teeth the hammer and hammer impact lugs are rotatively advanced toward the arrested anvil impact lugs but the hammer lugs at the same time are axially shifted up and away from the impact lugs on the anvil. They touch each other toward the end of this separating action but only the tips of the anvil and hammer lugs touch and not the respective impact faces thereof.

In any event no more than a 5½ degree twist of the defendant's torsion spring could be brought about in this manner under slow motion turning conditions. The evidence shows, however, that when defendant's tool is operating at its normal speed of about 1000 revolutions per minute such a small torsioning of the spring would be ineffective to cause the hammer to deliver the necessary impact blow to tighten a seated nut. In defendant's tool a windup of from about 30 degrees to 60 degrees of the torsion spring takes place in the normal use of the tool and this windup is effected by the rotating spindle while the hammer is in a rebound inertia suspended position. The impact lugs of the hammer are in contact with the impact lugs of the anvil for an instant at impact, because the rebound of the hammer impact lugs away from the impact lugs of the anvil instantly follows impact and the hammer stays suspended in rebound position, due to its inertia, throughout the period the camming clutch teeth of the clutch mechanism act to raise the hammer axially away from the anvil. The drive spindle winds up the spring while the hammer is suspended until sufficient winding is effected to cause the hammer to again begin to rotate and while the hammer lugs are in an elevated position relative to the anvil lugs. Thus the anvil plays no restraining part upon the hammer while energy is being stored by twisting or winding up the torsion spring and the 5½ degree slow motion windup does not prevail under dynamic operation. The hammer faces and the anvil impact lug faces are parallel with the axis of hammer rotation. All force delivered by the hammer is delivered in a rotary direction and there is no glancing blow or waste of power."

While it is probably difficult to visualize from this paper description the essential differences in operation of the Pott and Black & Decker tools, it becomes plainly discernible when displayed in moving pictures which I had the benefit of seeing during the trial. The working of the internal mechanism of the tool is shown when the cylindrical housing is cut away and the machine in operation is photographed by a camera taking pictures at a very rapid rate.

The films for all the motion pictures which have been herein referred to have been offered in evidence and presumably can be re-shown again when desired. The unusual and rather peculiar action of the torsion spring in the Black & Decker tool is to be noticed. The motion referred to is seemingly that of an oscillation of the spirals of the spring; or as otherwise described, an interrupted pendulum-like motion. This seems to be a particular feature of the torsion spring of the defendant's tool.

On the whole evidence, I find the defendant's contention is correct, that at least the claims of the Pott patent in view of the prior art must be very narrowly construed and so construed the Black & Decker tool does not infringe. If more broadly construed the Pott claims in suit are necessarily invalid for want of invention.

On the whole case I conclude that -

1. The Pott patent is invalid for want of invention in view of the prior art;

2. That if valid at all the claims must be strictly and narrowly construed and so construed the Black & Decker tool does not infringe, and

3. The complaint must be dismissed with costs.

Counsel may submit the proper order in due course.