**JACQUARD KNITTING MACHINE CO., Inc. v. ORDNANCE GAUGE CO., Inc. et al.**

**Civ. A. 10850.**

United States District Court
E. D. Pennsylvania.

Sept. 8, 1952.

See also, 95 F.Supp. 902.

J. Stanley Preston, Jerome G. Lee, New York City, for plaintiff.

Leonard L. Kalish, Philadelphia, Pa., for defendant.

KIRKPATRICK, Chief Judge.

This action is for infringement of Patent 2,397,456 issued to Sirmay, one of the defendants, and assigned by him to the plaintiff. It is for a method of transferring a loop of yarn or other material from one needle to another. Although not in terms directed to any particular kind of operation, its utility is in connection with knitting on automatic machines. Transfer mechanisms are old in the art and are used to obtain fancy effects in the cloth or to permit plain jersey cloth and ribbed cloth, as in sweaters with ribbed cuffs and ribbed bottom portions, to be knitted alternately on the same machine.

The plaintiff states that the object of the patent is to eliminate, or at least reduce, two main difficulties which are met with in transfer operations and which cause loss of time and extra expense. These are, breakage of loops, particularly with the so-called "tender yarns", and dropped stitches, which occur when the receiving needle misses the loop to be transferred. Claim 1 has to do with expanding the loop in a manner which will put the least possible strain on the yarn, and Claim 2 has to do with inserting the receiving needle into the loop in a manner designed to insure the accuracy of the movement and avoid misses. The validity and infringement of both claims are in issue.

### Validity

Claim 1 calls for the following steps:

"1. Placing the loop back of the needle hook in position to be cast off over the hook, then

"2. Enlarging the loop, by carrying the end of the loop forwardly and thereby drawing into the loop yarn from an adjacent loop or loops, and thereafter

"3. (a) Swinging one leg of the loop away from the adjacent side of the needle and

"(b) Swinging the forward end of the opposite leg of the loop across the

needle to open the loop to admit the loop-receiving instrument".

In order to get the loop into the proper shape to be taken by the receiving needle it must, unless already large enough, be made larger—a step which entails pulling more yarn into it—and widened out. In some prior art mechanisms these two steps are simultaneously accomplished by a clip on the delivery needle. However, according to the plaintiff's interpretation of the claim, enlargement is a preliminary step, accomplished when the delivery needle rises and the loop rides over the projection, or "bump", on the needle (step 2, above) before the clip reaches the loop. This gives a direct forward pull upon the loop and draws yarn from the adjacent loops (the patent assumes that the loop has not previously been made large enough not to require additional yarn), the result being that the strain on it will be less than if enlarging and sidewise opening took place simultaneously, as would be the case if the whole thing were done by the clip alone. The needle of the Foster U. S. Patent No. 885,-150 does precisely the same thing (see particularly the needle of Fig. 7 of that patent). It will be noted however that, although the claim does not call for any further enlargement of the loop or for the clip to pull any more yarn into it after it has passed the bump, the specification states "Continued movement of the clip passes the bulge of the clip into or further into the loop, with perhaps further enlargement of the loop * * *."

The effect of the clip upon the shape of the loop in opening and widening it as the clip moves through it upwardly with the rise of the delivery needle is what is set out in Claim 1 as the next step of the method (step 3, above). It is really nothing but a description of what happens to a loop when a delivery needle shaped like that in the patent drawings is used, but it is the point at which the plaintiff attempts to distinguish the patent in suit from Foster and the point at which the plaintiff contends the virtue of the patent resides.

The loop is spoken of as having two "legs" and a "crossbar", the legs being its sides and the crossbar its end. As you stand facing the machine the upward movement of the clip expands, pushes out, or "swings" out, the right-hand leg of the loop. In the drawing accompanying the patent in suit the needle below the bump is cut away or thinned down so that a portion of the left-hand leg of the loop also "swings" across the shank of the needle thus being drawn into and making part of the crossbar, which is now considerably lengthened. The Foster needle is also cut away to some extent, in that the projection recedes considerably below its high point, but it does not recede to an extent which will permit as much of the left-hand leg to swing across the needle and go into the crossbar as in the patent in suit. However, the claim calls for swinging only the "forward end" of the loop across the needle. Necessarily, as the needle of the Foster patent rises, yarn constituting the forward end of the left-hand leg has to be pulled across the back of the needle. As a matter of fact, the forward end of one or both legs of the loop is laid, slid or pulled across the needle by practically every clip needle of the prior art. The plaintiff makes something of the fact that the crossbar of the loop as formed by the Foster needle is very nearly at a right angle with the left-hand leg which, the plaintiff contends, is likely to cause breakage. This feature can be incorporated in the claim only by reference to the specification and drawing. The needle of the patent drawing is exactly that of the plaintiff's earlier patent No. 2,326,-694, and the Claim thus becomes open to the objection that it is merely stating what happens when a needle of the type shown in the two patents is used, in other words, merely a description of the function of a machine. At any rate, the edge of the needle need not be a sharp or cutting edge and one would assume that in practice the Foster needle would be sufficiently rounded or beveled to avoid that difficulty. It might also be noted that in the drawing of the patent in suit the angle at the edge of the clip between the crossbar and the right-hand leg is much sharper than a right angle. It is also true that the greater height of Foster's bump and its marked recession make the loop quite loose when the clip reaches it so that

the forward end of the leg can be pulled ·across the needle without undue strain.

However, the matter of anticipation does not depend upon whether the drawings of the needle shown in the patent in suit can be differentiated from the drawings of the earlier Foster needle. The patent in suit is for a method, and the drawings and specification do no more than illustrate one way of practicing it. In fact the plaintiff asserts (and, I think, correctly) that Claim 1 is so broad that the method could be practiced by a machine which substitutes entirely different loop-opening devices for the clip, or by hand. He really·must take that position for, if his method claims are limited to practice by the needle shown in the drawing, it would be no more than a description of the function of a machine. A method patent will not be sustained if it is merely a description of the way in which a machine works.

The only question is whether the operation of Foster's needle produces the method of the patent, and it is immaterial that the Foster needle was designed (if such be the fact) with an entirely different object in view, namely, to overcome the loss of lateral support which occurred in earlier transfer needles in which the clip was attached near the front edge of the needle staff. Taking the claim to mean what the plaintiff says it means and assuming that it is a genuine method claim, every step called for and described will occur when the Foster needle is used, and the claim is fully anticipated by Foster's disclosure.

What has been said is upon the theory that in the method of Claim 1 most, if not all, of the enlargement of the loop takes place when the bump on the shank of the needle passes through it. Actually, the claim does not say so and, as has been seen, the specification suggests that there may be further enlargement by the clip. If, in order to avoid anticipation by Foster, the claim should be read to mean that most of the enlargement may be accomplished by the clip after the loop has passed the bump (and, incidentally, this is the only construction which could possibly bring in the method of the defendant's machine as an in-

fringement), then the patent simply would not produce the result which the plaintiff considers the great contribution of Claim 1 to the art, namely, the extensive forward enlargement of the loop by the bump so that a sidewise pull from the clip will put a minimum of strain on the yarn. So construed, the claim would add nothing to the method of several of the prior art needles, there would be no advance and the patent would lack inventive novelty.

This makes it plain that the claim is too indefinite to comply with the requirement of the patent statute in respect of particularity and distinctness in claims. As has been pointed out, with the defendant's needle the preliminary enlargement of the loop by the bump is so slight as to be practically negligible, almost the entire enlargement being accomplished by the bridge. Whether or not the defendant infringes depends entirely upon a factor as to which the claim is silent and which the specification, in effect, says is of little importance. "The statutory requirement of particularity and distinctness in claims is met only when they clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field." United Carbon Co. v. Binney & Smith Co., 317 U.S. 228, 236, 63 S.Ct. 165, 170, 87 L.Ed. 232.

The method of Claim 2 combines the following steps:

"1. Opening the loop, then

"2. Placing the loop-receiving instrument across one leg of the loop, then

"3. Advancing the end of the loop to definitely place said end at the opposite side of the loop-receiving instrument from said leg,

"During such movement of the loop the position of the loop-receiving instrument nullifying any tendency of such loop-positioning movement to place the said leg at the same side of

the loop-receiving instrument as the end of the loop, and then

"4. Projecting the loop-receiving instrument to place its end beyond the end of the loop whereby the loop-receiving instrument is entered into the loop."

With every clip needle of the prior art the loop is transferred by projecting the end of the receiving needle through it and then lowering the clip needle, leaving the loop on the receiving needle. Claim 2 begins "In a method of transferring a knitting loop from a needle to another instrument * * *" but it does not cover the actual transfer or the manner of opening the loop or the size and shape of the loop and it might as well be called "a method of putting a needle into an open loop."

The claim calls for first advancing the loop-receiving needle across one leg of the loop, then raising the loop so that the end or crossbar is above the receiving needle and then advancing the receiving needle into the loop below the crossbar. It gives the sequence in which the movements of the two needles occur and does not say that there are any pauses or stops in the operation. The words "then" in the claim, coming after the description of each movement, might suggest such pauses and the specification says that an operation punctuated by such pauses is the preferred method, but it also says "this may not always be necessary", and the plaintiff's patent expert testified that the method of the patent can be performed when the two needles move continuously, if the timing is accurate. Thus, what it amounts to is that, in putting a needle into an open loop which is moving upward, it goes first over one side of the loop and then, when the loop is further raised, under the other side. When this is done, of course, it prevents the loop from passing the needle entirely on one side of it and so missing the stitch. Except for the pauses specified by the claim, this is what happens in any knitting machine which transfers from a clip needle where the dial and cylinder needles move continuously toward each other. Of course, they must be properly timed but in transfer machines the timing depends upon

angular adjustment of the two sets of cams operating the two banks of needles, a matter not claimed or mentioned in the specification.

Claim 2 is anticipated by Harris U. S. No. 1,669,296 if not by numerous other prior art disclosures.

If it is claimed that the patentable feature of the method lies in the brief pauses in the course of the operation (in spite of the fact that both the specification and the plaintiff's expert say they are not necessary) one need only read the Harris patent, comparing the specification point by point with the steps of Claim 2, to see how completely it anticipates.

Harris first advances the loop-carrying needle to the top of its rise, then lowers it somewhat and advances the dial needle so that it touches the crossbar of the loop. In this position the receiving needle has to be across one leg of the loop, as called for in the patent in suit. Harris then raises the loop-carrying needle enough to allow the receiving needle to pass under the crossbar just as the patent in suit does. The patent in suit says that the crossbar is raised to "definitely" place it at the opposite side of the receiving needle from the side it has just passed over. If this occurs in Harris—and it does—I do not see how it can occur otherwise than definitely. The position of the dial needle of Harris across one leg of the loop prior to the final raising of the crossbar to permit the dial needle to pass beneath it will nullify any tendency of the movement to get the leg and crossbar on the same side of the dial needle. The only point of possible distinction between Harris and the patent in suit is that Harris begins the operation by raising the loop-carrying needle all the way up and then lowering it a bit, which is a wholly immaterial matter. The patent in suit may allow a greater degree of variation in the timing of the two needles, but if Harris is accurately timed, his machine will work exactly in accordance with Claim 2.

### Infringement

The infringement charged is both contributory and direct, the contributory infringement being the defendant's supply-

ing to its customers machines which, the plaintiff alleges, can only be used in a manner which will infringe the claims of its method patent, the direct infringement being in the admitted fact that the defendant, before selling a machine, makes test runs in which it produces (but does not sell) a certain amount of knit goods. The latter is a rather substantial use—substantial in the sense that it is necessary to the defendant's business and, therefore, commercial. It could hardly sell its machines to its customers without making any test runs. I do not think that the "accidental" and unnecessary or unsought for infringement in the case of Condenser Corporation of America v. Micamold Radio Corporation, 2 Cir., 145 F.2d 878, establishes any precedent at all by which the defendant's test runs could be called de minimis.

The most that can be said on the matter of infringement of Claim 1 is that by making certain adjustments it is possible to operate the defendant's machine in a manner which would infringe. The defendant has offered evidence to the effect that, by the method in which it uses its stitch cams in a nonselective transfer operation to draw long loops, all the enlargement of the loops necessary is done before the projections or bumps on the needles ever reach them, thus eliminating the possibility of enlarging the loop by means of the bump or projection and of drawing yarn into a loop from the adjacent loops as required by Claim 1. This is the ordinary and, in fact, the only practical method of operating the defendant's machine. I do not think there is sufficient credible evidence to hold that the machines have been operated otherwise by the defendant. Beyond this, however, the matter of infringement of Claim 1 is so tied in with its first step, the description of which is so lacking in preciseness and definition (How much of the enlargement is made by the bump? How much by the clip?) as to invalidate the claim, that the question of infringement is almost academic.

As to Claim 2, if valid it would be infringed by any operation of the defendant's machine. In fact, it is probably infringed by almost every manufacturer who uses a clip needle transfer machine and I

should think it would take considerable ingenuity to conduct any such operation without coming within the terms of the claim. About the only way it could be done would be to raise the carrying needle all the way to its highest point and hold it there, and then pass the receiving needle through the fully opened and finally positioned loop—in other words, finish the movement of the carrying needle before the receiving needle begins to enter the loop. If the receiving needle is advanced earlier (as the loop moves up), it is bound to cross the leg of the loop before the loop-carrying needle has reached its highest point, and all the steps which result in the "nullifying" effect claimed as the great virtue of the patent will take place. As to that effect, it makes no difference whether the needles are successively halted at intervals and then moved on or whether the operation is continuous.

#### The Plaintiff's Attempt to Extend the Patent Monopoly

The plaintiff and the defendant are both manufacturers of knitting machines and are in sharp competition in that field. Neither of them makes knit goods for sale and, with the exception of the defendant's test runs of cloth, there is no evidence that either the plaintiff or the defendant has ever made use of the method which is the subject matter of the patent.

The defendant's machine must, for the purposes of this case, be taken to be unpatented. The plaintiff does have a patent for a knitting machine but, although it has examined the defendant's machines, it has never either publicly or in the course of this trial made any claim that they infringe.

If an injunction were to issue, the effect of it would be to prevent the defendant from selling an unpatented machine in competition with the plaintiff and it seems too plain for argument that that is what the plaintiff is aiming at.

The rule of the Carbice Corp. of America v. American Patents Dev. Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819; 283 U.S. 420, 51 S.Ct. 496, 75 L.Ed. 1153; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical and Mercoid cases, and others, that

courts will not grant the plaintiff relief in a patent infringement suit where to do so would extend his monopoly beyond the patent grant and restrain trade in unpatented materials or articles, forbids relief to the plaintiff in this case.

The ordinary situation in cases in which the rule has been applied is where the patentee by a system of contracts or written licenses has required anyone who wishes to make use of his patent to buy unpatented materials from him and has refused to license anyone who does not. In the present case the plaintiff has no such system. It has not granted any written licenses to manufacturers to use its method, although it necessarily grants an implied license to every such manufacturer who buys one of its machines. The notice of the institution of this suit which it broadcast to the trade carries the clear implication that those who use the defendant's machines may be sued for infringement. However, in B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367, the situation was not very different. That was a method patent, directed to certain steps in the manufacture of shoes. The patentee did not grant to shoe manufacturers, or ask them to take, written licenses. It sold unpatented, pre-cut and pre-coated soles for use in making shoes by the patented method. The defendant sold the same kind of soles. The Court assumed for the purposes of the decision that there was both contributory and direct infringement by the defendant and held that "the maintenance of this suit to restrain any form of infringement is contrary to public policy."

▮▮▮▮ It is plain that the plaintiff is primarily interested in eliminating competition in the manufacture of knitting machines, rather than obtaining the fruits of its method patent within the limits of the patent monopoly. However, I do not think that the motives of the plaintiff are particularly important. The question is, what effect will the restraint of infringement in any particular case have upon not only the rights of the defendant but upon the public interest. Will it give the patentee a partial monopoly beyond that which the patent law intends him to have? I am not sure that

"misuse" is an apt term to apply in this case because, except for instituting this suit, the plaintiff has not attempted to restrict the sale of unpatented machines. What the plaintiff is doing is asking the Court to do for it what would be plainly illegal if it undertook to do it itself by contract or license restrictions.

The scope of the rule and its policy to limit a patentee to what he has patented and to deny him any advantage by way of monopoly or suppression of competition beyond that is so broad as to make it imperative that an injunction be denied.

One must recognize the fact that to apply the rule of the Carbice and Mercoid cases to a case like this cuts away a great deal of the doctrine of contributory infringement and probably diminishes the value to the owner of many method patents. The Supreme Court fully recognized this in Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 669, 64 S.Ct. 268, 88 L.Ed. 376 when it said "Where there is a collision between the principle of the Carbice case and the conventional rules governing either direct or contributory infringement, the former prevails". Of course, it will often be easier and more effective, with a method patent, to proceed against the manufacturer of the means of using it rather than the users—particularly if the patent owner has succeeded in obtaining a patent for a way of performing some small operation (say a method of opening a can) which thousands of people perform daily. The difficulty will not be so great if the method is really meritorious and basic in an industry. However that may be, the strict limitations imposed by the patent laws on the grants of monopoly forbid the Court to assist the owner of a method patent to monopolize unpatented machines.

### Estoppel

The plaintiff contends that Sirmay, as the patentee, and Ordnance Gauge, as a party in privity with him, are estopped to deny the validity of the patent. This issue was tentatively disposed of by the Court at the outset of the trial. Of course, Sirmay would be estopped if validity were the only issue in the case. However, on the evi-

dence, statements, admissions and stipulations before me at that time, I found that estoppel did not apply against Ordnance Gauge. The reasons appear fully in the discussion and ruling in the record. The tentative ruling made at that time is now confirmed. The facts are found in accordance with the admissions and stipulations appearing in the record. In addition, I now rule, as I did at that time, that the facts which the plaintiff offered to prove in addition to those not admitted are insufficient to meet the burden of proving privity. The reasons for the Court's conclusions were stated fully on the record. It is unnecessary to devote further space in this opinion to the point, for the reason that the fact that the plaintiff is attempting by this suit to obtain a monopoly beyond the scope of its patent bars it from injunctive relief.

## Prior Public Use and Abandonment

 The patent in suit issued on an application filed in 1943, which was the second of two divisional applications stemming from an original application filed in 1936. The original application filed by Sirmay and assigned to the plaintiff was for a machine. It contained no method claims. In 1938 the plaintiff, as required by the Patent Office, filed a divisional application for the needle disclosed in the earlier machine application. This application contained claims for the method of the patent in suit, as well as for the needle. Again, division was required and the method claims alone were embodied in an application (filed in 1943) which became the patent in suit.

The importance of all this on the question of prior public use is that the plaintiff concedes prior public use (December 1934 or January 1935) more than two years before the 1938 application (which was the first one that contained the method claims), and I am of the opinion that the defendant has failed to prove public use more than two years before the 1936 application.

I am of the opinion that the original or 1936 application discloses a method sufficiently to support the application for the patent in suit as a true divisional-continuation application and to give the plaintiff the date of May 9, 1936, as an effective filing date.

True, there was a hiatus in the claiming of the method between January 12, 1943, and July 16, 1943, during which time no method claims were pending before the Patent Office, but the fact is that the disclosure of the method was continuously before the Patent Office and "The continuity maintained in the successive applications shows that plaintiff intended to retain, not to abandon, the disclosed invention". See opinion of Judge McGranery in Jacquard Knitting Machine Co. v. Ordnance Gauge Co., D.C., 95 F.Supp. 902, 908.

## Double Patenting

 I accept the plaintiff's contention that the method of the patent in suit is not restricted to the machine of the original machine patent or, for that matter, to the needle of the needle patent and I agree that there is nothing in the patent which prevents it from covering the use of the method in connection with other than clip needles or in a hand operation. It is, therefore, not the same claimed invention as that of either of the two earlier patents and is not open to the defense of prolongation of the patent monopoly by double patenting. This result, of course, makes the patent vulnerable to a far wider range of anticipating disclosures than if it were confined to the machine and needle of the two earlier patents, but it is the position which the plaintiff perforce must take in order to avoid the plain and well settled rule that a mere description of the function of a machine is not patentable as a method.

## The Counterclaim

The defendant Ordnance Gauge's counterclaim asks for injunctive relief restraining the plaintiff from instituting or threatening suits against the defendant's customers on account of their purchase or use of its machines.

 The counterclaim is rather unusual in that it does not ask for permanent injunctive relief or for damages but merely for a preliminary injunction "pending the determination of the issues of validity

and infringement". Unless the defendant has in mind appellate proceedings by the plaintiff, the need for the relief sought ends with the determination that the patent is invalid. On that theory alone, the following discussion is predicated.

To entitle the moving party to an injunction in any case, he must show two things, first, that the defendant has done or threatened to do something which constitutes an actionable wrong. It is not enough that some act or course of conduct on the part of the defendant has inconvenienced the plaintiff or put him to expense or occasioned him loss. Second, that there is reasonable cause to believe that the defendant will continue the wrong or will accomplish it unless restrained. This requirement may, of course, be inferred from the nature and character of the wrong, without the necessity of showing express declarations indicating such an intention.

In support of the counterclaim, the defendant offered evidence of what it describes as an integrated plan on the part of the plaintiff, not only to prevent the sale of the defendant's competing machine but, to destroy the defendant's business. The evidence warrants the following findings:

The plaintiff brought this suit for the purpose of preventing the defendant from manufacturing and selling its machines.

The suit was filed on April 19, 1950, just prior to the Knitting Arts Exposition in New York (April 24 to 28, 1950), and on April 21 the plaintiff's patent attorney gave brief news releases to trade journals, announcing the institution of the suit and advising the trade that knit-goods manufacturers using the defendant's machine would be infringing the patent. The filing of the suit and the news releases were intentionally timed by the plaintiff to come just before the exposition, with the object of making the suit as effective as possible in discouraging prospective customers for the defendant's machine, being fully aware the filing of the suit at that time, even if the outcome should prove unsuccessful, would be highly injurious to the defendant's business. At the exposition, the plaintiff's salesmen were naturally asked questions by potential customers about the pendency of the suit, which questions they answered, and I have no doubt that they repeated in substance what was implied in the news release, namely, that the use of the defendant's machine by manufacturers would infringe the patent and make the users liable to suit. At the exposition, the plaintiff also advertised and took orders for a larger machine of a type similar to the defendant's, which machine it had not begun to manufacture, the orders being made subject to cancellation by either party.

The plaintiff strenuously resisted efforts on the part of the defendant to advance the case for trial. However, the trial was advanced and both parties contributed to the unconscionable delay in getting it finally disposed of. In fact, I feel some responsibility, as well, for letting it get out of hand.

For what it is worth, there has been a great deal of bitter personal feeling between the plaintiff's Vice-President, Albertman, and Sirmay, and Albertman no doubt had a good deal to do with Sirmay's leaving the plaintiff company.

 Under the law of Pennsylvania, which governs here, an action for malicious use of civil process will not lie since there was no arrest of the defendant's person or seizure of his property. Publix .Drug Co. v. Breyer Ice Cream Company, 347 Pa. 346, 32 A.2d 413.

If the plaintiff's conduct is actionable at all, it must be under the antitrust laws or the general law of unfair competition.

 It is true that a patent may be so used as to violate the antitrust laws. Thus a trade agreement involving the rights of the parties thereto to use a certain patent, which transcends what is necessary to protect the patent and which controls the output and price of goods, is illegal. Standard Sanitary Manufacturing Company v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107. In a case of that kind, the bringing of a suit for infringement may be evidence of, or a step in, the conspiracy, but it is a far cry from that to say that one who simply comes into court

with a suit upon a presumptively valid patent can by so doing violate a criminal statute. The rule that denies an injunction where to allow it would extend the monopoly to unpatented articles is based solely upon the restricted nature of the right conferred upon the patent owner by the patent statute.[1] Actually, any patent owner who sues for the infringement of a patent which turns out to be invalid is attempting to restrain the sale of an article to which the patent laws have given no monopoly. In the present case, the plaintiff is no doubt attempting to obtain monopoly rights to which it is not entitled but it is attempting to obtain them by asking a Court of the United States for a judgment in its favor and the denial of the judgment it seeks accomplishes everything that the policy of the antitrust laws was intended to accomplish. I am satisfied that the bringing of a suit for patent infringement on an unadjudicated patent cannot, per se, subject the patent owner to prosecution or civil liability for violation of the antitrust laws. To hold otherwise would be to make a serious inroad upon the integrity of the patent system.

If the institution of this suit was not in itself an illegal act, I can find no evidence in the case of a general conspiracy or combination to violate the antitrust laws.

 As to the charge of unfair competition, again the central fact is this patent infringement suit. Actually, the defendant has not shown any injury from any act of the plaintiff other than the institution of the suit, plus the legitimate concomitant of a properly worded notice to the trade with its implied warning to potential infringers. It has never been held, so far as I know, that the fact that a plaintiff elects to bring such a suit at a time when the publicity attending it will cause injury to the defendant above and beyond the expense of defending it makes the bringing of the suit actionable. In my opinion, the various other acts charged against the plaintiff do not sum up to a case of unfair trade competition.

It will be seen that the counterclaim centers entirely upon a suit for patent infringement. Personal animus, the timing of suit, notices to potential customers and intentional delay in prosecution are all facts which might indicate an intent to injure the defendant by use of the process of the court but, unless the bringing of the suit constitutes an actionable wrong upon some theory, the case falls to pieces.

I cannot find from the evidence presented in this case that the plaintiff has been guilty of any actionable wrong involving civil liability.

There is no evidence that the plaintiff has repeated its warning to the trade or has made any threats to prosecute users of the defendant's machine beyond what was implied in its original notice published in the trade paper. There is nothing to show that the plaintiff would continue or renew its publicity after the judgment of invalidity has been entered by this Court.

### Attorney's Fees

 The defendant has asked for an allowance of its attorney's fees as costs.

The statute provides that the Court "may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment on any patent case," 35 U.S.C.A. § 70. This discretion, apparently a broad one, has been rather narrowly circumscribed by several decisions by courts of appeals, notably Park-In-Theatres v. Perkins, 9 Cir., 190 F.2d 137. In that case

---

1. "I agree that the patentee may not extend his exclusive statutory right to make, use, and vend by forbidding one practicing the invention from using in such practice an unpatented article susceptible to such use. He may not obtain an injunction against such user for infringement. This is a pure question of the extent of the right of exclusion conferred by the patent statute. It nowise involves the antitrust acts. A patent is property and it may, like other property, be so used as to violate those acts, but that is not this case." Mr. Justice Roberts in Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 674, 64 S.Ct. 268, 275, 88 L.Ed. 376, dissenting as to other points but concurring as to this. See also Leitch Mfg. Co. v. Barber Co., 302 U.S. 458, 463, 58 S. Ct. 288, 82 L.Ed. 371.

the Court said, 190 F.2d at page 142, "The exercise of discretion in favor of such an allowance should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants normally bear." The Court recognized that dilatory tactics or a wilful effort to prevent expeditious disposition of the suit could be a ground for the exercise of discretion but, absent that, a finding that the suit was brought in bad faith would seem to be an almost necessary requisite.

The defendant has asked for a finding that this suit was not brought in good faith. "Good faith", "bad faith", are terms which elude attempts at precise definition. One can say with confidence that any law suit begun for some ulterior purpose with no intention of prosecuting it to the finish or with a certainty that it cannot succeed would be in bad faith. I should think that an infringement suit upon an expired patent or upon one invalidated by a judgment of the highest court or where the charge of infringement is plainly a sham would be within that category. The present case is not. The plaintiff had a patent hitherto unlitigated and prima facie valid and, as found, the defendant was infringing one of its claims. An attempt to obtain something which it turns out the plaintiff was not legally entitled to can hardly be called bad faith, since that situation exists in any law suit which goes in favor of the defendant. I cannot find that the plaintiff in this case did not believe that it was legally entitled to the injunction which it asked for and I cannot affirm the defendant's request.

I have already touched upon the matter of undue delay. The plaintiff's efforts to prevent the speedy hearing of the case failed and caused no delay. After that, the defendant was fully as responsible as the plaintiff for the manner in which the proceedings were dragged out.

The defendant's request for attorney's fees is denied.